Rec 067330

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
NOV 5 2007
U.S. COURT OF FEDERAL CLAIMS

HARTFORD FIRE INSURANCE COMPANY,

Plaintiff

v.

No. 07-774 C

THE UNITED STATES,

Defendant.

**COMPLAINT**

Plaintiff, Hartford Fire Insurance Company through its undersigned counsel, The Hustead Law Firm, a Professional Corporation, files its Complaint against Defendant and states as follows:

**I. Parties**

1. Hartford Fire Insurance Company ("Hartford") is a Connecticut insurance company with its principal offices located at One Hartford Plaza, Hartford, Connecticut 06155.

2. The United States Department of Veterans Affairs (the "VA"), formerly know as The Veterans Administration, is a Cabinet level department of the United States Government, with its central offices located at 810 Vermont Avenue, NW, Washington, DC 20420.

**II. Jurisdiction**

3. Pursuant to 40 USCS §601 through §613, this Court has original subject matter jurisdiction over this case because Hartford's claim is being made against The United States relating to a contract dispute with the VA stemming from contracts for the procurement of construction services at the Veteran Affairs Medical Center located at 1055 Clermont Street, Denver, Colorado 80220-3808 (the "VAMC").

## III. General Allegations

4. On or about September 15, 2003, the VA solicited two bids for work on the VMAC.

5. One bid was for a project known as the Replace Steam & Condensate project (" Steam & Condensate Project") and the other bid was for a project known as the Hot Water Heaters project (" Hot Water Project").

6. The Steam & Condensate Project contract bid solicitation required the contractor to provide a bid for all labor, tools, equipment, materials, and supervision to complete all the work to install a new steam and condensate piping system and the appurtenant underground fittings and fixtures between the Building 8 boiler plant and Building 1 sub-basement at the VAMC.

7. The How Water Project contract bid solicitation requested a proposal to provide all labor, tools, equipment, materials, and supervision necessary to construct water supply headers for domestic hot and cold water and recirculation water piping for the eighth and ninth floors of Building 1 at the VAMC.

8. The Hot Water Project contract bid proposal also required bidders to provide domestic water heat exchangers in various locations.

9. As part of each project solicitation, the VA furnished a narrative describing the work, contract duration, and estimated cost range.

10. The VA also furnished with each bid proposal a set of limited drawings depicting the project.

11. To assist Western Sun Enterprises, Inc. ("Western") in preparing a bid proposal it hired M-E Engineering, Inc. ("M-E"), a design engineering company specializing in mechanical and electrical design.

12. Prior to completing its bid proposal, Western arranged for a meeting with the VA and a tour of the project site.

13. The original Steam & Condensate Project contract bid proposal called for a steam piping and condensate piping to be installed underground.

14. Although the VA's bid proposal directed the bidder to use existing underground structures to route its piping, the VA's contracting officer technical representative wanted to change the project to utilize above ground overhead pipe routing supported by a new structural system.

15. The VA instructed Western to submit a bid to construct an above ground overhead piping system as part of the Steam & Condensate Project.

16. Based on the VA's directive, Western changed its bid proposal for the Steam & Condensate Project contract to include an above ground overhead piping system and the appurtenant structural support system.

17. Based on the verbal proposal requirements set forth by the VA's contracting officer technical representative for the Steam & Condensate Project, Western submitted a proposal to complete the project using an above ground piping system routed overhead on a newly constructed structural support system.

18. After submitting its proposal for the Steam & Condensate Project, Western was summoned to a meeting with the VA's contract officer, wherein Western was informed that the

bid price submitted to complete the overhead routing piping system was too costly for the VA's budget.

19. The VA rejected Western's bid proposal to complete the Steam & Condensate Project using an overhead routing piping system.

20. On information and belief, the VA informed Western at that time that it needed to award the contract for the Steam & Condensate Project before September 30, 2003 or lose the funding allocated for that project.

21. In light of its budget and timing issues, the VA requested Western submit its bid proposal for the Steam & Condensate Project using an underground piping system.

22. The VA promised Western that if it built the project with above ground overhead piping in lieu of installing the piping underground the VA would issue change orders to compensate Western for the additional cost of installing the piping system and the required structural support system above ground.

23. The VA subsequently awarded the Steam & Condensate contract to Western without modification to the original scope of work, which included an underground piping system.

24. On September 30, 2003, Western and the VA signed a contract for the Steam & Condensate Project wherein Western's scope of work included the installation of an underground piping system.

25. A true and accurate copy of the Steam & Condensate Project Solicitation, Offer and Award V554C-838-03-8(a) is attached as **Exhibit A**.

26. Western's bid price for the Steam & Condensate Project contract without modification to its original scope was $443,674.90.

27. The VA also awarded the Hot Water Project contract to Western for a bid price of $243,032.00.

28. The Hot Water Project contract was signed by the VA and Western on September 24, 2003.

29. A true and accurate copy of the Hot Water Project Solicitation, Offer and Award V554C-839-03-8(a) is attached as **Exhibit B.**

30. Hartford provided Western with the bonds for the Steam & Condensate Project and the Hot Water Project.

31. A true and accurate copy of the bonds, 37BCSBU9555 and 37BCSBU9556, are attached as **Exhibit C**.

32. Notice to proceed on the projects was issued by the VA on September 30, 2003.

33. After the notice to proceed was issued, the VA was slow in providing as-built drawings to Western, slowing the overall design of the project by M-E.

34. The VA instructed Western that it could begin excavating on the Steam & Condensate Project on December 1, 2003 despite the unavailability of needed as-built drawings.

35. During the initial excavating on the Steam & Condensate Project, Western discovered that the existing trench boxes adjacent to Building 8 South were backfilled with lean concrete.

36. Western also discovered the presence of asbestos during its excavation of the utility trenches.

37. Western provided the VA with change order proposals to remove the lean concrete backfill and to remediate the asbestos.

38. In response to Western's change order proposals, the VA issued signed change orders increasing the contract amount and extending the contract duration for the Steam & Condensate Project.

39. Before completing a substantial amount of the Steam & Condensate Project, the contracting officer with which Western had been dealing directly with at the VA unexpectedly died in an automobile accident.

40. After the Steam & Condensate Project contract was signed, the VA and Western agreed to a change the pipe routing to allow the use of underground trenches for the first fourth of the piping run and then provide above ground piping for the remaining piping run.

41. As part of the change in the pipe routing, Western was required to provide aluminum cladding over the piping insulation.

42. Aluminum cladding was not part of Western's original scope of work and was not included in Western's bid proposal for the Steam & Condensate Project contract.

43. Western submitted a contract change order for the installation of the aluminum cladding.

44. Western's change order for the installation of aluminum cladding was rejected by the VA.

45. To accommodate the change in the pipe routing on the Steam & Condensate Project, Western was required to work during off-hours and weekends to avoid traffic issues and prevent interference with the VAMC's daily operations.

46. Working during off-hours and on weekends was not part of Western's original scope of work and was not included in Western's bid proposal for the Steam & Condensate Project contract.

47. The Steam & Condensate Project's original bid solicitation indicated all work was to be performed during normal business hours.

48. Western submitted a contract change order for the additional time and compensation for working during off-hours and weekends.

49. Western's change order for working during off-hours and weekends was rejected by the VA.

50. As part of the change in the pipe routing on the Steam & Condensate Project, Western was required to install equipment to pump and monitor condensate collection in low areas along the piping route.

51. The installation of condensate pumping and monitoring equipment was not part of Western's original scope of work and was not included in Western's bid proposal for the Steam & Condensate Project contract.

52. Western submitted a contract change order for the installation of condensate pumping and monitoring equipment.

53. Western's change order for the installation of condensate pumping and monitoring equipment was rejected by the VA.

54. The VA also required Western to install redundant condensate pumping equipment as part of the Steam & Condensate Project.

55. The redundant condensate pumping equipment was not part of Western's original scope of work and was not included in Western's bid proposal for the Steam & Condensate Project contract.

56. Western submitted a contract change order for the installation of redundant condensate pumping and monitoring equipment.

57. Western's change order for the installation of redundant condensate pumping and monitoring equipment was rejected by the VA.

58. As part of the change in the pipe routing, Western also incurred additional costs for installing and welding pipe that was suspended approximately twenty feet overhead instead of running underground as originally contemplated in Western's bid proposal for the Steam & Condensate Project contract.

59. The installation of above ground overhead piping was not part of Western's original scope of work and was not included in Western's bid proposal for the Steam & Condensate Project contract.

60. Western submitted a contract change order for the additional costs and time required for the installation and welding of above ground overhead piping.

61. Western's change order for the additional costs and time required for the installation and welding of the above ground overhead piping was rejected by the VA.

62. After the VA rejected Western's change orders relating to the change in the pipe routing, Western sent the project's new contracting officer documents supporting Western's position on the change orders it had submitted and also sent a letter citing the agreement Western had reached with the VA's previous contracting officer to install an above ground overhead piping system using the change order process to secure additional compensation for Western.

63. The VA's new contracting officer rejected Western's assertions regarding the agreement Western had reached with the VA's previous contracting officer and ordered Western to proceed with installing the above ground overhead piping system, even though the Steam & Condensate Project's contract required the installation of an underground piping system.

64. Western continued to work on the Steam & Condensate Project until it ran out of funds for the project.

65. On October 7, 2004, the VA sent Western a "Show Cause Notice" claiming that several of Western's subcontractors had stopped work because they had not been paid by Western.

66. Western responded to the VA's notice on October 22, 2004, citing again its agreement with the VA's previous contracting officer and making claim for additional compensation and an extension of the project schedule to compensate for the change in scope.

67. On December 17, 2004, the VA sent Western a letter denying its claim for additional compensation.

68. On January 24, 2005, the VA notified Hartford that Western was in default on the Steam & Condensate Project and the Hot Water Project.

69. On February 10, 2005, the VA issued its "Final Decision" notifying Western that its contracts were terminated.

70. After the VA terminated Western, it entered into two takeover agreements with Hartford.

71. A true and accurate copy of the takeover agreements are attached as **Exhibit D**.

72. Under the takeover agreements Hartford reserved its right to pursue damages from the United States resulting from and relating to increased cost of work, changes in the work and in the work conditions by the United States, unforeseen conditions, changes in access/timing for performance of the work, design changes, decreased productivity, decreased overhead, lost profits, costs of un-reimbursed extra-contractual work, lost profits, unapproved change orders and costs of completion.

73. After entering into the takeover agreements, Hartford took over the projects as the completing surety and rehired Western to complete the projects.

74. Hartford has performed the obligations of its principal, Western, under the performance and payment bonds.

75. As the completing surety for Western, Hartford is the rightful assignee of Western's claims under its contracts with the VA.

76. On May 7, 2007, pursuant to Federal Acquisitions Regulations "FAR" 52.233-1 and FAR 33.207, Western filed a claim certification for each of the projects.

77. A true and accurate copy of Western's claim for certification relating to the Hot Water Project and Steam & Condensate Project is attached as **Exhibit E**.

78. The VA's contracting officer never provided a written decision in response to Western's claims.

## IV. First Claim for Relief
## (Unjust Enrichment)

79. Hartford hereby incorporates by reference all the averments contained in foregoing paragraphs as though fully set forth herein.

80. Hartford completed the Steam & Condensate Project for Western based on a scope of work that was not included in Western's original contract.

81. The Hartford installed a significantly more expensive above ground overhead piping system than was specified in Western's original scope of work.

82. The above ground overhead piping system was installed at the direction of the VA.

83. The VA was aware of the change in scope and the increased cost associated with the change.

84. Western submitted contract change orders for the more expensive above ground overhead piping system.

85. The VA denied Western's change order requests for additional funds to install an above ground overhead piping system in lieu of the underground system required in Western's contract.

86. The initial accepted bid for the Hot Water Project was $243,032.00.

87. The initial accepted bid for the Steam & Condensate Project was $443,674.90.

88. The total cost to complete both projects was $1,137,509.15.

89. Western received $660,174.43 from the VA for its work on the projects.

90. Hartford received $180,612.99 from the VA for its work as the completing surety.

91. The cost to complete both projects exceeds the amount paid by the VA by at least $296,721.73.

92. The VA has received a benefit from Hartford and Western for which it has not paid.

93. It was reasonable for Hartford to expect the VA would pay it for the additional work it performed on the projects as the completely surety.

94. By receiving a benefit from Hartford for which the VA has not paid, the VA has been unjustly enriched to the detriment of Hartford.

95. As a direct and proximate cause of the VA's unjust enrichment, Hartford has incurred damages and other cost for which it has a right to be compensated.

## V. Second Claim for Relief
## (Breach of Contract)

96. Hartford hereby incorporates by reference all the averments contained in foregoing paragraphs as though fully set forth herein.

97. Pursuant to the agreement between Western and the VA, the VA agreed to pay Western for change orders relating to the modification of the Steam & Condensate Project from an underground piping system to an above ground overhead piping system.

98. Pursuant to its contract with Western, the VA had a duty to pay Western for the work it performed on the projects.

99. The VA has failed to pay Western and/or Hartford for changing the Steam & Condensate project from an underground piping system to an above ground overhead piping system.

100. The VA's failure to pay Western and then Hartford, as the completing surety, for changing the Steam & Condensate Project from an underground piping system to an above ground overhead piping system constitutes a breach of contract.

101. The VA's failure to pay Western and then Hartford, as the completing surety, for work performed on the projects constitutes a breach of contract.

102. As a direct and proximate cause of the VA's breach, Hartford has suffered damages for which it has a right to be compensated.

103. As a direct and proximate cause of the VA's breach, Hartford has suffered damages in the form of overhead and profits due to Western and owing to the Hartford by virtue of Western's assignment of its claims to the Hartford.

## VI. Third Claim for Relief
## (Breach of Implied Covenant of Good Faith and Fair Dealing)

104. Hartford hereby incorporates by reference all the averments contained in foregoing paragraphs as though fully set forth herein.

105. When the VA entered into an agreement with Western, it had a duty to act in good faith and deal fairly with Western and Hartford.

106. When the VA entered into an agreement with Western it impliedly covenanted to cooperate with Western so that both Western and the VA might obtain the full benefits of the agreement.

107. When the VA entered into an agreement with Western it impliedly covenanted to refrain from any act that would injure Western's right to receive the benefit the agreement.

108. The VA initially asked Western to change its original bid proposal for the Steam & Condensate Project to include an above ground overhead piping system.

109. Western submitted a revised proposal for the Steam & Condensate Project pursuant to the VA's request.

110. Western's revised proposal for the Steam & Condensate Project included an above ground overhead piping system instead of an underground piping system.

111. The bid price for Western's revised proposal was in excess of $800,000.

112. When the VA received Western's revised proposal, they informed Western they did not have enough money in the project budget to award the contract based on the above ground overhead piping system.

113. In lieu of accepting Western's revised proposal, the VA asked Western to submit its bid proposal for the Steam & Condensate Project based on an underground piping system.

114. When the VA asked Western to submit its revised bid proposal, the VA told Western that it (the VA) still intended to have Western construct the Steam & Condensate Project using an above ground overhead piping system and the VA promised that it would make up for any additional costs Western anticipated incurring by using contract change orders.

115. The VA agreed to have Western install an above ground overhead piping system on the Steam & Condensate Project in lieu of an underground piping system.

116. The VA asked Western to submit a bid for the Steam & Condensate Project with an underground piping system even though it intended for Western to install an above ground overhead piping system.

117. The VA never changed the scope of the Steam & Condensate Project to include an above ground overhead piping system and did not object when Western and Hartford constructed an above ground overhead piping system.

118. After the projects were completed, the VA received and took possession of the above ground overhead piping system it instructed Western to build.

119. The VA knew the above ground overhead piping system would be more expensive to install than the under ground system called for in the contact.

120. The VA agreed to pay Western for the additional cost to construct the project utilizing an above ground overhead piping system configuration.

121. The VA failed to pay Western and Hartford for the additional cost to install the above ground overhead piping system.

122. The VA's failure to pay Western and Hartford, in light of its agreement with Western, constitutes a breach of the implied covenant of good faith and fair dealing.

123. As a result of the VA's breach of the implied covenant of good faith and fair dealing, Hartford has suffered damages for which it has the right to be compensated.

**VII. Forth Claim for Relief**
**(Quantum Meruit)**

124. Hartford hereby incorporates by reference all the averments contained in foregoing paragraphs as though fully set forth herein.

125. By completing the project, Hartford has provided a service to the VA.

126. Hartford is owed the reasonable value of the services it provided to the VA.

127. The VA has failed to pay Hartford for the reasonable value of the services provided by Hartford.

128. As a direct and proximate cause of the VA's failure to pay Hartford for the reasonable value of its services, Hartford has suffered damages for which it has the right to be compensated.

**VIII. Fifth Claim for Relief**
**(Equitable Subrogation)**

129. Hartford hereby incorporates by reference all the averments contained in foregoing paragraphs as though fully set forth herein.

130. The VA failed to pay Western for all the work it performed on the projects.

131. Western failed to pay some of its subcontractors that worked on the project.

132. Western's failure to pay its subcontractors constituted a default under its contract with the VA.

133. Hartford cured Western's default by paying Western's subcontractors and completing the project.

134. Hartford paid Western to complete the projects pursuant to the terms of its bond.

135. Western has filed a claim certification with the VA regarding the amount still owed by the VA for additional work performed on the projects.

136. By virtue of its payment to Western and its subcontractors, Hartford has become subrogated to the rights of Western and its subcontractors to assert a lien against the projects and is thereby entitled to balances owed by the VA to the extent those balances might cover Hartford's payments, cure costs, attorney's fees, costs, and any other expenses incurred by Hartford relating to any claims made under the bonds issued on the behalf of Western by Hartford.

WHEREFORE, Plaintiff Hartford requests that this Court:

1. Enter judgment for Hartford and against the United States in the amount of $278,721.73 (equal to the contract shortfall less adjustments: $296,721.73 - $18,000) regarding Hartford's unjust enrichment claim, breach of contract claim, breach of implied covenant of good faith and fair dealing claim, quantum meruit claim and equitable subrogation claim;

2. Enter judgment for Hartford and against the United States in the amount of $170,626.37 for overhead and profits due and owing regarding Hartford's breach of contract claim, breach of implied covenant of good faith and fair dealing claim and equitable subrogation claim;

3. Enter judgment for Hartford and against the United States in the amount of $158,162.80 for late payment interest through October 30, 2007 due and owing regarding Hartford's breach of contract claim, breach of implied covenant of good faith and fair dealing claim, quantum meruit claim, and equitable subrogation claim;

4. Award Hartford interest from October 30, 2007 forward at the statutory maximum rate on all pre-judgment and post-judgment damages awarded to Hartford;

6. Award Hartford its attorneys fees, disbursements, and costs expended and incurred as a result of the issuance of bonds to Western; and

7. Enter judgment for any other and further relief as this Court deems just and proper.

Respectfully submitted this 2nd day of November, 2007.

THE HUSTEAD LAW FIRM
*A Professional Corporation*

By: ______________________

Patrick Q. Hustead, Esq.
Colorado Bar No. 16905
4643 S. Ulster Street, Suite 1250
Denver, CO 80237
Telephone: (303) 721-5000
*Attorney for Plaintiff, Hartford Fire Insurance Company*

# Exhibit A

| SOLICITATION, OFFER, AND AWARD (Construction, Alteration, or Repair) | 1. SOLICITATION NO. RFP 554-58-03 | 2. TYPE OF SOLICITATION ☐ ADVERTISED (IFB) ☒ NEGOTIATED (RFP) | 3. DATE ISSUED 9/05/03 | PAGE OF PAGES 1 of |
|---|---|---|---|---|

IMPORTANT — The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST | 6. PROJECT NO. 554-00-010 |
|---|---|---|
| 7. ISSUED BY CODE | 8. ADDRESS OFFER TO | |
| CONTRACTING OFFICER (554/90C)<br>VA MEDICAL CENTER<br>1055 CLERMONT ST.<br>ROOM 4E109<br>DENVER, CO 80220 | CONTRACTING OFFICER (554/90C)<br>VA MEDICAL CENTER<br>1055 CLERMONT ST.<br>ROOM 4E109<br>DENVER, CO 80220 | |

| 9. FOR INFORMATION CALL: | A. NAME MARGIE M. NATION | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) (303) 398-7461, FAX # (303) 393-2860 |
|---|---|---|

## SOLICITATION

NOTE: In advertised solicitations "offer and offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS *(Title, identifying no., date)*:

Provide all labor, tools, equipment, materials and supervision to complete all work for Design Services necessary to either replace and abate ACM or install new and encapsulate existing ACM steam and condensate system and associated underground piping between the Bldg. 8 boiler plant and Bldg. 1 sub-basement at the VA Medical Center, Denver, Colorado. Work shall be performed in accordance with furnished scope of work and as described in the attached specifications under Project No. 554-00-010. This project is to be completed in 120 calendar days after receipt of the Notice to Proceed.

- This Contract Action is to be Completed Utilizing the Small Business Administration's 8(a) Program.
- The Estimated Cost Range is Between $250,000.00 and $500,000.00.
- The most current Davis Bacon Wage Decision for the Denver, Co area is to be utilized for this Project.
- This project is to be performed under NAICS 235110 for which the size standard is $ 12 million.

All questions concerning this solicitation shall be addressed, in writing, to the Contracting Officer. Questions may be faxed to (303) 393-2860 or e-mailed to Margie.Nation@med.va.gov.

11. The Contractor shall begin performance within 10 calendar days and complete it within 120 calendar days after receiving ☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. *(See 52.211-10 .)*

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? *(If "YES," indicate within how many calendar days after award in Item 12B.)* ☒ YES ☐ NO | 12B. CALENDAR DAYS 10 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 1 copies to perform the work required are due at the place specified in Item 8 by 10:00am *(hour)* local time 9/16/03 23 *(date)*. If this is an advertised solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee ☐ is, ☒ is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

Offers providing less than 60 calendar days for Government acceptance after the date offers are due will be considered nonrespon-sive and will be rejected.

STANDARD FORM 1442

**OFFER** *(Must be fully completed by offeror)*

14. NAME AND ADDRESS OF OFFEROR *(Include ZIP Code)*
Western Sun Enterprises, Inc.
120 S. Federal Blvd.
Denver, CO 80219

DUNS NUMBER 883222028
CODE FACILITY CODE

15. TELEPHONE NO. & FAX NO. *(Include area code)*
303-922-5500

16. REMITTANCE ADDRESS *(Include only if different than Item 14)*

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government within ____60____ calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

AMOUNTS ▶

**ITEM NO. 1: $443,674.90**

(In words) **Four hundred forty-three thousand, six hundred seventy-four dollars and ninety cents**

18. The offeror agrees (a) to carry out this offer if the Government accepts it by signing Item 31B within the time specified in Item 13D, and (b) to furnish any required performance and payment bonds.

19. ACKNOWLEDGMENT OF AMENDMENTS
*(The offeror acknowledges receipt of amendments to the solicitation — give number and date of each)*

| AMENDMENT NO. | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | | | | | | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)*

20B. SIGNATURE

20C. OFFER DATE

**AWARD** *(To be completed by Government)*

21. ITEMS ACCEPTED:
All

22. AMOUNT
$443,674.90

23. ACCOUNTING AND APPROPRIATION DATA
554-3630160-967-854200-3220 0100C10X8

24. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ▶ ITEM 7

25. NEGOTIATED PURSUANT TO
☐ 10 USC 2304(a) ( ) ☒ 41 USC 253(c) (5) & 15 USC 637(a)

26. ADMINISTERED BY CODE 554/90C
VA Eastern Colorado Health Care System
ContractSpecialist
1055 Clermont St.
Denver, CO 80220

27. PAYMENT WILL BE MADE BY
Director, Business Office (04)
ECHCS
1055 Clermont St.
Denver, CO 80220

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

☐ 28. NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return __2__ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract.

☐ 29. AWARD *(Contractor is not required to sign this document.)* Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)*
CASIE COE BACA

30B. SIGNATURE
[signature]

30C. DATE
9/30/03

31A. NAME OF CONTRACTING OFFICER *(Type or print)*
MARGIE M. NATION

31B. UNITED STATES OF AMERICA
BY Margie M. Nation

31C. AWARD DATE
9/30/03

In Lieu of STANDARD FORM 1442 (AUTOMATED)

# Exhibit B

Revised 2nd Offer

| SOLICITATION, OFFER, AND AWARD (Construction, Alteration, or Repair) | 1. SOLICITATION NO. RFP 554-59-03 | 2. TYPE OF SOLICITATION ☐ ADVERTISED *(IFB)* ☒ NEGOTIATED *(RFP)* | 3. DATE ISSUED 9/15/03 | PAGE OF PAGES 1 of |
|---|---|---|---|---|

IMPORTANT — The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST | 6. PROJECT NO. 554-00-006 |
|---|---|---|

| 7. ISSUED BY CODE | 8. ADDRESS OFFER TO |
|---|---|
| CONTRACTING OFFICER (554/90C)<br>VA MEDICAL CENTER<br>1055 CLERMONT ST.<br>ROOM 4E109<br>DENVER, CO 80220 | CONTRACTING OFFICER (554/90C)<br>VA MEDICAL CENTER<br>1055 CLERMONT ST.<br>ROOM 4E109<br>DENVER, CO 80220 |

| 9. FOR INFORMATION CALL: | A. NAME MARGIE M. NATION | B. TELEPHONE NO. *(Include area code) (NO COLLECT CALLS)* (303) 398-7461, FAX # (303) 393-2860 |
|---|---|---|

## SOLICITATION

NOTE: In advertised solicitations "offer and offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS *(Title, identifying no., date)*:

Provide all labor, tools, equipment, materials and supervision to complete all work for Design/Build Services necessary to provide domestic water heat exchangers in various locations and to supply water supply headers for domestic hot, cold and recirculation water piping for the 8th and 9th floors of building # 1 at the VA Medical Center, Denver, Colorado. Work shall be performed in accordance with furnished scope of work and as described in the attached specifications under Project No. 554-00-006. This project is to be completed in 90 calendar days after receipt of the Notice to Proceed.

- This Contract Action is to be Completed Utilizing the Small Business Administration's 8(a) Program.
- The Estimated Cost Range is Between $100,000.00 and $250,000.00.
- The most current Davis Bacon Wage Decision for the Denver, Co area is to be utilized for this Project.
- This project is to be performed under NAICS 235110 for which the size standard is $ 12 million.

All questions concerning this solicitation shall be addressed, in writing, to the Contracting Officer. Questions may be faxed to (303) 393-2860 or e-mailed to Margie.Nation@med.va.gov.

11. The Contractor shall begin performance within 10 calendar days and complete it within 90 calendar days after receiving ☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. *(See 52.211-10__)*

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? *(If "YES," indicate within how many calendar days after award in Item 12B.)* ☒ YES ☐ NO | 12B. CALENDAR DAYS 10 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 1 copies to perform the work required are due at the place specified in Item 8 by 4:30pm *(hour)* local time 9/23/03 *(date)*. If this is an advertised solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee ☐ is, ☒ is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 60 calendar days for Government acceptance after the date offers are due will be considered nonrespon-sive and will be rejected.

**OFFER** *(Must be fully completed by offeror)*

14. NAME AND ADDRESS OF OFFEROR *(Include ZIP Code)*
Western Son Enterprises, Inc
120 S. Federal Blvd
Denver, CO 80219

DUNS NUMBER
CODE FACILITY CODE

15. TELEPHONE NO. & FAX NO. *(Include area code)*
303-922-5500 303-922-5509

16. REMITTANCE ADDRESS *(Include only if different than Item 14)*

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government within ____60____ calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

AMOUNTS ▶

**Base Bid:** $ 243,032.00 **In words:** Two Hundred Forty Three Thousand Thirty Two Dollars + 00/100

**Deduct Alternate # 1 (hospital wing being served @ 8th floor):** 10,477.00

**Deduct Alternate # 2 (hospital wing being served @ 9th floor):** 10,534.00

18. The offeror agrees (a) to carry out this offer if the Government accepts it by signing Item 31B within the time specified in Item 13D, and (b) to furnish any required performance and payment bonds.

**19. ACKNOWLEDGMENT OF AMENDMENTS**
*(The offeror acknowledges receipt of amendments to the solicitation — give number and date of each)*

| AMENDMENT NO. | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | | | | | | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)* Casie C de Baca President

20B. SIGNATURE [signature]

20C. OFFER DATE

**AWARD** *(To be completed by Government)*

21 ITEMS ACCEPTED:

22. AMOUNT

23. ACCOUNTING AND APPROPRIATION DATA

24. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ▶ ITEM 7

25. NEGOTIATED PURSUANT TO
☐ 10 USC 2304(a) ( ) ✕ 41 USC 252(c) ( 5 )

26. ADMINISTERED BY CODE
SAME AS # 7

27. PAYMENT WILL BE MADE BY
SAME AS # 7

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

☐ 28. NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return __2__ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract.

☐ 29. AWARD *(Contractor is not required to sign this document.)* Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)* Casie C de Baca President

30B. SIGNATURE [signature]

30C. DATE 9-24-03

31A. NAME OF CONTRACTING OFFICER *(Type or print)*
MARGIE M. NATION

31B. UNITED STATES OF AMERICA
BY

31C. AWARD DATE

# Exhibit C

| PAYMENT BOND (See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) | FORM APPROVED OMB NO 9000-0045 BOND NO. 37BCSBU9556 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

| PRINCIPAL (Legal name and business address) | TYPE OF ORGANIZATION ("X" one) |
|---|---|
| Western Sun Enterprises, Inc.<br>11590 Jackson Street<br>Thornton, CO 80233 | ☐ INDIVIDUAL ☐ PARTNERSHIP<br>☐ JOINT VENTURE ☒ CORPORATION<br>☐<br>STATE OF INCORPORATION: CO |
| SURETY(IES) (Name(s) and business address(es)) | PENAL SUM OF BOND: MILLION(S): — THOUSAND(S): 443 HUNDRED(S): 674 CENTS: 90 |
| Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | CONTRACT DATE: — CONTRACT NO.: V554C-838-04-8(a) |

OBLIGATION:

We, the Principal and Surety (ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The Above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

WITNESS:

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

PRINCIPAL — Western Sun Enterprises, Inc.

| | 1. | 2. | 3. | |
|---|---|---|---|---|
| SIGNATURE(S) | (Seal) | (Seal) | (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

INDIVIDUAL SURETY(IES)

| | 1. | 2. |
|---|---|---|
| SIGNATURE(S) | (Seal) | (Seal) |
| NAME(S) (Typed) | 1. | 2. |

CORPORATE SURETY(IES)

| SURETY A | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | CT | $ | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed) | 1. J.R. Richards<br>Attorney-in-Fact | 2. Elke E. Eriksen<br>Denver, Colorado | | |

NSN 7540-01-152-8061
Previous edition not usable

STANDARD FORM 25-A (REV 1-90)
Prescribed by GSA – FAR (48 CFR) 53.228(c)

CORPORATE SURETY(IES) (Continued)

| | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| SURETY B NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |
| SURETY C NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |
| SURETY D NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |
| SURETY E NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |
| SURETY F NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |
| SURETY G NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

INSTRUCTIONS

6. This form, for the protection of persons supplying labor and material, is used when a payment bond is required under the Act of August 24, 1935, 49 Stat. 793 (40 U.S.C. 270a-270e). Any deviation from this form will require the written approval of the Administrator of General Services.

7. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

8. (a) Corporations executing the bond as sureties must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties. (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

9. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

10. Type the name and title of each person signing this bond in the space provided.

**PERFORMANCE BOND**
(See Instructions on reverse)

DATE BOND EXECUTED (Must be same or later than date of contract)

FORM APPROVED OMB NO 9000-0045

BOND NO.37BCSBU9558

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

PRINCIPAL (Legal name and business address)

Western Sun Enterprises, Inc.
11590 Jackson Street
Thornton, CO 80233

TYPE OF ORGANIZATION ("X" one)

- ☐ INDIVIDUAL
- ☐ PARTNERSHIP
- ☐ JOINT VENTURE
- ☒ CORPORATION

STATE OF INCORPORATION: CO

SURETY(IES) (Name(s) and business address(es))

Hartford Fire Insurance Company
Hartford Plaza
Hartford, CT 06115

PENAL SUM OF BOND

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
|---|---|---|---|
| | 443 | 674 | 90 |

CONTRACT DATE:

CONTRACT NO.: V554C-838-04-8(a)

OBLIGATION:

We, the Principal and Surety (ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:
The Principal has entered into the contract identified above.

THEREFORE:
The above obligation is void if the Principal – (a)(1) Performs and fulfills all the undertakings, covenants terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of those modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act, (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

WITNESS:
The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

PRINCIPAL

Western Sun Enterprises, Inc.

| | | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

INDIVIDUAL SURETY(IES)

| | | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S) (Typed) | 1. | 2. |

CORPORATE SURETY(IES)

| SURETY A | | | | |
|---|---|---|---|---|
| NAME & ADDRESS | Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | STATE OF INC.: CT | LIABILITY LIMIT: $ | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed) | 1. J.R. Richards<br>Attorney-in-Fact | 2. Elke E. Eriksen<br>Denver, Colorado | | |

NSN 7540-01-152-8060 Previous edition not usable EXPIRATION DATE 9-30-95 24-107 STANDARD FORM 25 (REV 1-90) Prescribed by GSA – FAR (48 CFR) 53.228(b)

① Premium 2.5% = $11,092.00
② Class B Contract
③ GIA

OBLIGEE: USA (VA Medical Center)
1055 Clermont Street Rm 109
Denver, CO 80220

CORPORATE SURETY(IES) (Continued)

| SURETY B | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | |
| SIGNATURES | 1. | 2. | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | Seal |
| **SURETY C** | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | |
| SIGNATURES | 1. | 2. | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | Seal |
| **SURETY D** | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | |
| SIGNATURES | 1. | 2. | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | Seal |
| **SURETY E** | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | |
| SIGNATURES | 1. | 2. | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | Seal |
| **SURETY F** | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | |
| SIGNATURES | 1. | 2. | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | Seal |
| **SURETY G** | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | |
| SIGNATURES | 1. | 2. | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | Seal |

| BOND PREMIUM ➡ | RATE PER THOUSAND | TOTAL |
|---|---|---|
| | $ $25.00 Per Thousand | $ 11,092.00 |

INSTRUCTIONS

1. This form is authorized for use in connection with Government contracts. Any deviation from this form will require the written approval of the Administrator of General Services.

2. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

3. (a) Corporations executing the bond as sureties must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties. (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

4. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

5. Type the name and title of each person signing this bond in the space provided.

10/19/2007 09:25 2538532212 THE HARTFORD PAGE 01/08

06/21/2005 16:08 FAX 002

| PAYMENT BOND (See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) | FORM APPROVED OMB NO 9000-0045 BOND NO. 37BCSBU9555 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

| PRINCIPAL (Legal name and business address) | TYPE OF ORGANIZATION ("X" one) |
|---|---|
| Western Sun Enterprises, Inc.<br>11590 Jackson Street<br>Thornton, CO 80233 | ☐ INDIVIDUAL ☐ PARTNERSHIP<br>☐ JOINT VENTURE ☒ CORPORATION<br>☐<br>STATE OF INCORPORATION: CO |
| SURETY(IES) (Name(s) and business address(es)) | PENAL SUM OF BOND: MILLION(S): — THOUSAND(S): 243 HUNDRED(S): 032 CENTS: 00 |
| Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | CONTRACT DATE: — CONTRACT NO.: V554C-839-B(a) |

OBLIGATION:

We, the Principal and Surety (ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:
The Above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

WITNESS:
The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

**PRINCIPAL**

Western Sun Enterprises, Inc

| | | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

**INDIVIDUAL SURETY(IES)**

| | | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S) (Typed) | 1. | 2. |

**CORPORATE SURETY(IES)**

| SURETY A | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | CT | $ | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed) | 1. J.R. Richards<br>Attorney-in-Fact | 2. Elke E. Eriksen<br>Denver, Colorado | | |

NSN 7540-01-152-8061
Previous edition not usable

STANDARD FORM 25-A (REV 1-90)
Prescribed by GSA – FAR (48 CFR) 53.228(c)

**CORPORATE SURETY(IES) (Continued)**

| SURETY B | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed | 1. | 2. | | |

| SURETY C | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed | 1. | 2. | | |

| SURETY D | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed | 1. | 2. | | |

| SURETY E | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed | 1. | 2. | | |

| SURETY F | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed | 1. | 2. | | |

| SURETY G | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed | 1. | 2. | | |

## INSTRUCTIONS

6. This form, for the protection of persons supplying labor and material, is used when a payment bond is required under the Act of August 24, 1935, 49 Stat. 793 (40 U.S.C. 270a-270e). Any deviation from this form will require the written approval of the Administrator of General Services.

7. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

8. (a) Corporations executing the bond as sureties must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties. (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

9. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

10. Type the name and title of each person signing this bond in the space provided.

10/19/2027 09:26 2538532212 THE HARTFORD PAGE 03/08
08/23/2004 13:11 FAX 002/005

| PERFORMANCE BOND (See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) | FORM APPROVED OMB NO 9000-0045 BOND NO. 37BCSBU9555 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

| PRINCIPAL (Legal name and business address) | TYPE OF ORGANIZATION ("X" one) |
|---|---|
| Western Sun Enterprises, Inc.<br>11590 Jackson Street<br>Thornton, CO 80233 | ☐ INDIVIDUAL ☐ PARTNERSHIP<br>☐ JOINT VENTURE ☒ CORPORATION<br>STATE OF INCORPORATION: CO |
| SURETY(IES) (Name(s) and business address(es)) | PENAL SUM OF BOND: MILLION(S): — THOUSAND(S): 243 HUNDRED(S): 032 CENTS: 00 |
| Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | CONTRACT DATE: — CONTRACT NO. V554C-839-8(a) |

OBLIGATION:

We, the Principal and Surety (ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:
The Principal has entered into the contract identified above.

THEREFORE:
The above obligation is void if the Principal – (a)(1) Performs and fulfills all the undertakings, covenants terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of those modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act, (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

WITNESS:
The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

PRINCIPAL

Western Sun Enterprises, Inc.

| | | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

INDIVDUAL SURETY(IES)

| | | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S) (Typed) | 1. | 2. |

CORPORATE SURETY(IES)

| SURETY A | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | Hartford Fire Insurance Company<br>Hartford Plaza<br>Hartford, CT 06115 | CT | $ | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed) | 1. J.R. Richards<br>Attorney-in-Fact | 2. Elke E. Eriksen<br>Denver, Colorado | | |

NSN 7540-01-152-8060 Previous edition not usable EXPIRATION DATE 9-30-95 24-107 STANDARD FORM 25 (REV 1-90) Prescribed by GSA – FAR (48 CFR) 53.228(b)

① Premium 2.5% = $6076.00
② Class B Contract
③ Obligee: USA (VA Medical Center)
1055 Clermont Street
Denver, Co 80220

NOV 18 98

KCPRD

CORPORATE SURETY(IES) (Continued)

| SURETY B | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

| SURETY C | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

| SURETY D | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

| SURETY E | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

| SURETY F | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

| SURETY G | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Corporate |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | Seal |

| BOND PREMIUM ➔ | RATE PER THOUSAND | TOTAL |
|---|---|---|
| | $ $25.00 Per Thousand | $6,076.00 |

## INSTRUCTIONS

1. This form is authorized for use in connection with Government contracts. Any deviation from this form will require the written approval of the Administrator of General Services.

2. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

3. (a) Corporations executing the bond as sureties must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties. (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

4. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

5. Type the name and title of each person signing this bond in the space provided.

# Exhibit D

# SURETY TAKEOVER AGREEMENT
# CONTRACT V554C-838
# DEPARTMENT OF VETERANS AFFAIRS
# EASTERN COLORADO HEALTH CARE SYSTEM
# 1055 CLERMONT STREET
# DENVER, CO 80220

This Surety Takeover Agreement is entered into this 4th day of October 2005, between the United States of America, represented by the Department of Veterans Affairs (VA) Eastern Colorado HealthCare System, Denver, Colorado (hereinafter "the Government"), and The Hartford Fire Insurance Company, a corporation of the State of Connecticut, with its principal place of business at Hartford, Connecticut (hereinafter "the Surety") and Western Sun Enterprises, Inc. (hereinafter "the Contractor") (collectively, the "Parties"). The Parties witness that:

**WHEREAS**, the Government entered into Contract V554C-838 (hereinafter "the Contract"), with the Contractor, for the performance of the Contract for construction of the project Design and Build Replace Condensate Pipe ("Project"); and

**WHEREAS**, the Surety, issued Payment and Performance Bonds ("Payment Bond" or "Performance Bond" or "Bonds" as the context may warrant), in the amount of four hundred forty three thousand six hundred seventy four ($443,674.90) dollars for each Bond number 37BCBU9556 to guarantee, that such Contractor would fully perform in accordance with the Contract. The Bonds are fully incorporated herein by this reference; and

**WHEREAS**, the Surety, by the Performance Bond, had guaranteed that such Contractor would fully perform in accordance with the Contract; and

**WHEREAS**, by Final Decision, dated February 11, 2005, the Government terminated the Contractor's right to proceed with further contract work.

**WHEREAS**, the Government desires to effect the completion of said Contract in order to preserve continuity of performance and to expedite completion and to avoid the delay and inconvenience of letting a replacement contract; and

**WHEREAS**, the Government has made demand upon the Surety for completion of the project in accordance with obligations under the said Performance Bond; and

**WHEREAS**, the Surety has advised the Government that it will undertake this completion of the project and it has contracted or will contract for completing the project work remaining under the Contract in accordance with its terms and conditions. The Surety has advised the Government of its intention to utilize personnel from the Contractor's organization to complete the project.

**WHEREAS**, the Parties do not by their execution of this Agreement, intend to waive, limit or modify their existing legal rights or obligations unless there is clear and specific language in this Agreement evidencing intent to do so. No provisions of this agreement shall be deemed to be construed as waiving any of the Parties rights or remedies as set forth in the Contract or at law.

**NOW, THEREFORE**, in consideration of the mutual promises made by the Parties hereinafter contained, the Parties hereto agree as follows:

1. Surety undertakes and agrees to take over and perform, or to procure the performance of, all work and all other obligations of the Contract called for under the said Contract not presently completed or fulfilled, including the correction and repair of all defective workmanship. The agreed scope of remaining work is attached hereto as Exhibit A. It is mutually agreed that the Contract documents include, without limitation, all of the General and other Provisions of the Contract, and the plans and specifications thereof, including any supplemental agreements, time extensions and/or change orders issued to date, all of which being fully incorporated into this Agreement as if set out at length.

2. The Parties hereby agree that the original Contract price was $443,674.90, and that, to date, five (5) supplemental agreements have been issued totaling $40,380.00, one (1) of those being a credit of ($9,059.35) and that eleven (11) progress payments have been made to the Contractor totaling $436,527.04, leaving $38,468.51 in said Contract as an unpaid Contract balance.

3. The Parties hereby agree that the Surety shall be paid in accordance with and in the manner provided by the Contract subject to the following conditions:

a. The agreed amount of unpaid contract balance shall be reduced by any withholding directed by the Department of Labor pursuant to the Davis Bacon Act, or Service Contract Act, or any other Act administered by that Department.

b. Any unpaid amounts earned by the Contractor, including retained percentages and progress payments for work accomplished prior to termination, shall be subject to debts due the Government against the Contractor, under the Contract, except to the extent that such unpaid earnings may be required to permit payment to the completing Surety of its actual cost and expenses incurred in the completion of the work, exclusive of its payments and obligations under the payment bond given in connection with the Contract.

c. In no event shall the Surety be entitled to be paid any amount in excess of its total expenditures necessarily made in completing the work and discharging its liabilities under the Performance Bond.

d. "Actual costs and expenses of completion" do not include expenses under the Surety's Payment Bond obligations.

4. Surety agrees to diligently proceed with and to complete the work in accordance with the terms and conditions expressed in the original Contract within sixty (60) Calendar days from its receipt of a notice to proceed. **PROVIDED, HOWEVER,** that this shall not affect any liability of the Contract or of the Surety for actual damages computed from the completion date of the Contract, except to the extent that they are excusable under the Contract.

5. Surety agrees to prepare, certify, and submit its request for payment in accordance with the terms of the Contract. Preparation of the payment requests shall be undertaken by the Contractor but reviewed and executed by the Surety. The Parties agree that invoices shall be submitted in the name of the Surety, and the Government shall review all requests for payment, and, upon approval, shall forward payment thereon by means of Electronic Funds Transfer (EFT) to the Surety in accordance with FAR 52.232-34, Payment by Electronic Funds Transfer –Other Than Central Contractor Registration clause of the Contract. The Surety shall supply to the Government the information required to make EFT payments. Surety shall supply the Government with all records, documents, and information reasonably available and necessary to properly verify claimed completion costs, and the vouchers or other evidence of the Surety's disbursements shall be prima facie evidence to the Government of the fact and extent of the Surety's same costs of completion.

6. It is expressly understood and agreed to that the Government shall in no way be bound to any contractor, or subcontractor, by the terms of this Agreement, and shall look only to the Surety for completion of the Contract and for compliance with the terms of the Agreement. It is also confirmed by the Parties that the Surety shall be represented on the Project by a designated representative of the Contractor, who be serving as completion contractor for the performing Surety. In such role, the Contractor will represent the Surety in dealings with the Government on a day to day basis to deal with construction issues on the Project. The Surety's designated representative is Mr. Casie Cde Baca. The Surety designated representative shall have the authority to approve field changes to the project work in the amount not to exceed $2,500.00 per change with $10,000.00 aggregate limit.

7. Nothing in this Agreement will be in derogation of the Surety's obligation to the United States, under the Performance Bond given in connection with the Contract, for unpaid withholding taxes.

8. Surety expressly agrees that nothing herein contained shall be construed as constituting an acceptance by the Government of the work heretofore performed by the Contractor or as modifying, limiting, or releasing Surety from its obligations to the United States under its Performance and Payment Bonds for the Contract.

9. The recitals hereinabove are not mere recitals but form a material part of this Agreement and shall be deemed as contractual in nature.

10. The Government confirms that the Surety's liability hereunder shall not extend beyond the penal sum of it's Performance Bond, but does not release the Surety from its obligation to complete the project, and that expenditure relating to the completion efforts by the Surety hereunder shall effect a dollar for dollar reduction in the penal sum of said Bond.

11. Nothing in this Agreement shall be construed as creating, altering or abridging any rights of any party hereto, or other person, arising out of any Payment Bond given under the Contract, or out of any payment under such bond.

12. Payments to the Surety to reimburse it for discharging its liabilities under the Payment Bond shall be only on the authority of:

a. Mutual separate agreement between the Government, the defaulting Contractor, and the Surety;

b. Determination of the Comptroller General as to payee and amount; or

c. Order of a court of competent jurisdiction.

13. Surety does hereby fully release the Government from any and all liability whatsoever in connection with any payments heretofore made by the Government to the Contractor.

14. This agreement shall bind the Parties hereto and their successors and shall not be modified or amended except by a written document duly executed by the Parties hereto, or their successors.

15. The Parties hereto and their signatories warrant that they have the power and authority to enter into this agreement.

The Parties agree that the provisions of this Agreement will be applied and interpreted in a manner consistent with each other so as to carry out the purposes and intent of the Parties, but if for any reason any provision is unenforceable or invalid, such provisions shall be deemed stricken and the remaining provisions shall be carried out with the same force and effect as if the stricken portion had not been part of this Agreement.

**IN WITNESS THEREOF**, the Parties hereto have respectively executed this Takeover Agreement as of the day and year first above written.

**WITNESS**

____________________ ____________________
(Surety) (Contractor)

By: Richard Luksos ________ Casie Cole Bass
(Print Name) (Print Name)

**The United States of America**

____________________

By: Raymond Toinoki
(Print Name)

Date Signed: 10/4/05

# EXHIBIT A

**CONTRACT V554C-838**
**REPLACE CONDENSATE PIPING**
**VA Eastern Colorado Health Care System**
**Denver, Colorado**

1. Complete the four (4") inch condensate piping to manhole at Building 6, approximately twenty five (25') feet and remove the temporary four (4") inch condensate above ground line from Building 6 to Boiler Plant, approximately one (100') feet;

2. Install backfill in trench from Building 6 to manhole;

3. Backfill trench at from Building 6 to Building 8, Boiler Plant;

4. Repave asphalt over trench; and

5. Complete the electrical power and control wiring to new condensate pumps located in the Sub-basement of Building 1.

**SURETY TAKEOVER AGREEMENT**
**CONTRACT V554C-839**
**DEPARTMENT OF VETERANS AFFAIRS**
**EASTERN COLORADO HEALTH CARE SYSTEM**
**1055 CLERMONT STREET**
**DENVER, CO 80220**

This Surety Takeover Agreement is entered into this 7th day of October 2005, between the United States of America, represented by the Department of Veterans Affairs (VA) Eastern Colorado HealthCare System, Denver, Colorado (hereinafter "the Government"), and The Hartford Fire Insurance Company, a corporation of the State of Connecticut, with its principal place of business at **Hartford**, Connecticut (hereinafter "the Surety") and Western Sun Enterprises, Inc. (hereinafter "the Contractor") (collectively, the "Parties"). The Parties witness that:

**WHEREAS**, the Government entered into Contract V554C-839 (hereinafter "the Contract"), with the Contractor, for the performance of the Contract for construction of the project Design and Build Replace Hot Water Heaters ("Project"); and

**WHEREAS**, the Surety, issued Payment and Performance Bonds ("Payment Bond" or "Performance Bond" or "Bonds" as the context may warrant), in the amount of two hundred forty three thousand thirty two ($243,032.00) dollars for each Bond number 37BCBU9555 to guarantee, that such Contractor would fully perform in accordance with the Contract. The Bonds are fully incorporated herein by this reference; and

**WHEREAS**, the Surety, by the Performance Bond, had guaranteed that such Contractor would fully perform in accordance with the Contract; and

**WHEREAS**, by Final Decision, dated February 11, 2005, the Government terminated the Contractor's right to proceed with further contract work.

**WHEREAS**, the Government desires to effect the completion of said Contract in order to preserve continuity of performance and to expedite completion and to avoid the delay and inconvenience of letting a replacement contract; and

**WHEREAS**, the Government has made demand upon the Surety for completion of the project in accordance with obligations under the said Performance Bond; and

**WHEREAS**, the Surety has advised the Government that it will undertake this completion of the project and it has contracted or will contract for completing the project work remaining under the Contract in accordance with its terms and conditions. The Surety has advised the Government of its intention to utilize personnel from the Contractor's organization to complete the project.

**WHEREAS**, the Parties do not by their execution of this Agreement, intend to waive, limit or modify their existing legal rights or obligations unless there is clear and specific language in this Agreement evidencing intent to do so. No provisions of this agreement shall be deemed to be construed as waiving any of the Parties rights or remedies as set forth in the Contract or at law.

**NOW, THEREFORE**, in consideration of the mutual promises made by the Parties hereinafter contained, the Parties hereto agree as follows:

1. Surety undertakes and agrees to take over and perform, or to procure the performance of, all work and all other obligations of the Contract called for under the said Contract not presently completed or fulfilled, including the correction and repair of all defective workmanship. **The agreed scope of remaining work is attached hereto as Exhibit A.** It is mutually agreed that the Contract documents include, without limitation, all of the General and other Provisions of the Contract, and the plans and specifications thereof, including any supplemental agreements, time extensions and/or change orders issued to date, all of which being fully incorporated into this Agreement as if set out at length.

2. The Parties hereby agree that the original Contract price was $243,032.00, and that, to date, four (4) supplemental agreements have been issued totaling $23,288.70, and that eleven (11) progress payments have been made to the Contractor totaling $223,100.03, leaving $43,220.67 in said Contract as an unpaid Contract balance.

3. The Parties hereby agree that the Surety shall be paid in accordance with and in the manner provided by the Contract subject to the following conditions:

a. The agreed amount of unpaid contract balance shall be reduced by any withholding directed by the Department of Labor pursuant to the Davis Bacon Act, or Service Contract Act, or any other Act administered by that Department.

b. Any unpaid amounts earned by the Contractor, including retained percentages and progress payments for work accomplished prior to termination, shall be subject to debts due the Government against the Contractor, under the Contract, except to the extent that such unpaid earnings may be required to permit payment to the completing Surety of its actual cost and expenses incurred in the completion of the work, exclusive of its payments and obligations under the payment bond given in connection with the Contract.

c. In no event shall the Surety be entitled to be paid any amount in excess of its total expenditures necessarily made in completing the work and discharging its liabilities under the Performance Bond.

d. "Actual costs and expenses of completion" do not include expenses under the Surety's Payment Bond obligations.

4. Surety agrees to diligently proceed with and to complete the work in accordance with the terms and conditions expressed in the original Contract within sixty (60) Calendar days from its receipt of a notice to proceed. **PROVIDED, HOWEVER,** that this shall not affect any liability of the Contract or of the Surety for actual damages computed from the completion date of the Contract, except to the extent that they are excusable under the Contract.

5. Surety agrees to prepare, certify, and submit its request for payment in accordance with the terms of the Contract. Preparation of the payment requests shall be undertaken by the Contractor but reviewed and executed by the Surety. The Parties agree that invoices shall be submitted in the name of the Surety, and the Government shall review all requests for payment, and, upon approval, shall forward payment thereon by means of Electronic Funds Transfer (EFT) to the Surety in accordance with FAR 52.232-34 Payment By Electronic Funds Transfer—Other Than Central Contractor Registration clause of the Contract. The Surety shall supply to the Government the information required to make EFT payments. Surety shall supply the Government with all records, documents, and information reasonably available and necessary to properly verify claimed completion costs, and the vouchers or other evidence of the Surety's disbursements shall be prima facie evidence to the Government of the fact and extent of the Surety's same costs of completion.

6. It is expressly understood and agreed to that the Government shall in no way be bound to any contractor, or subcontractor, by the terms of this Agreement, and shall look only to the Surety for completion of the Contract and for compliance with the terms of the Agreement. It is also confirmed by the Parties that the Surety shall be represented on the Project by a designated representative of the Contractor, who will be serving as completion contractor for the performing Surety. In such role, the Contractor will represent the Surety in dealings with the Government on a day to day basis to deal with construction issues on the Project. The Surety's designated representative is Mr. Casie Cde Baca. The Surety designated representative shall have the authority to approve field changes to the project work in the amount not to exceed $2,500.00 per change with $10,000.00 aggregate limit.

7. Nothing in this Agreement will be in derogation of the Surety's obligation to the United States, under the Performance Bond given in connection with the Contract, for unpaid withholding taxes.

8. Surety expressly agrees that nothing herein contained shall be construed as constituting an acceptance by the Government of the work heretofore performed by the Contractor or as modifying, limiting, or releasing Surety from its obligations to the United States under its Performance and Payment Bonds for the Contract.

9. The recitals hereinabove are not mere recitals but form a material part of this Agreement and shall be deemed as contractual in nature.

10. The Government confirms that the Surety's liability hereunder shall not extend beyond the penal sum of its Performance Bond, but does not release the Surety from its obligation to complete the project, and that expenditure relating to the completion efforts by the Surety hereunder shall effect a dollar for dollar reduction in the penal sum of said Bond.

11. Nothing in this Agreement shall be construed as creating, altering or abridging any rights of any party hereto, or other person, arising out of the Payment Bond given under the Contract, or out of any payment under such bond.

12. Payments to the Surety to reimburse it for discharging its liabilities under the Payment Bond shall be only on the authority of:

a. Mutual separate agreement between the Government, the Contractor, and the Surety;

b. Determination of the Comptroller General as to payee and amount; or

c. Order of a court of competent jurisdiction.

13. Surety does hereby fully release the Government from any and all liability whatsoever in connection with any payments heretofore made by the Government to the Contractor.

14. This Agreement shall bind the Parties hereto and their successors and shall not be modified or amended except by a written document duly executed by the Parties hereto, or their successors.

15. The Parties hereto and their signatories warrant that they have the power and authority to enter into this agreement.

The Parties agree that the provisions of this Agreement will be applied and interpreted in a manner consistent with each other so as to carry out the purposes and intent of the Parties, but if for any reason any provision is unenforceable or invalid, such provisions shall be deemed stricken and the remaining provisions shall be carried out with the same force and effect as if the stricken portion had not been part of this Agreement.

**IN WITNESS THEREOF**, the Parties hereto have respectively executed this Takeover Agreement as of the day and year first above written.

**WITNESS**

(Surety)

By: Richard Levesque
(Print Name)

(Contractor)

Casie Cole Baa
(Print Name)

**The United States of America**

By: Raymond Perry
(Print Name)

Date Signed: 11/4/05

# EXHIBIT A

**CONTRACT V554C-839**
**REPLACE HOT WATER HEATERS**
**VA Eastern Colorado Health Care System**
**Denver, Colorado**

1. Demo two (2) existing and install two (2) new hot water heat exchangers, piping, insulation, controls and alarms, located in the basement of Building 19;

2. Demo two (2) existing and install two (2) new hot water exchangers, piping, insulation, controls and alarms, located in the basement of Building 21;

3. Install hot water re-circulation pump, piping and insulation in the 8th floor ceiling of Building 1, approximately four hundred (400) hundred feet of ½" pipe; and

4. Install power and control to new hot and cold domestic water boosters located in the sub-basement of Building 1.

# Exhibit E

# LYNX CONSTRUCTION & CONSULTING, LLC

May 16, 2007

Mr. Ray Tomori
Contracting Officer
**VA ECHS Medical Center FMS-138**
**VISN 19 Rocky Mountain Contracting**
1055 Clermont Street
Denver, CO 80220

| | | |
|---|---|---|
| ***Re:*** | ***Principal:*** | ***Western Sun Enterprises, Inc.*** |
| | ***Claim No.:*** | ***564 S 24961 for Replace Hot Water Heaters V554C-839-03-8(a)*** |
| | | ***564 S 24961 for Replace Steam & Condensate V554C-838-03-8(a)*** |
| | ***Bond No.:*** | ***37BCSBU9555; Replace Hot Water Heaters V554C-839-03-8(a)*** |
| | | ***37BCSBU9556; Replace Steam & Condensate V554C-838-03-8(a)*** |
| | ***Obligee:*** | ***Department of Veterans Affairs Medical Center, Denver, CO*** |
| | ***Item:*** | ***Claim*** |
| | ***LYNX No:*** | ***4047*** |

Dear Ray:

We are writing on behalf of the Surety, The Hartford, and the Contractor, Western Sun Enterprises. Please find attached to this letter, a revised claim filed jointly by The Hartford and Western Sun Enterprises. This version contains a breakdown of damages between projects and contains certifications as requested by your previous request.

The intent is to resolve all issues with all parties in one forum. In the past, you have suggested an alternate dispute resolution by mediation. This approach is acceptable to both The Hartford and Western Sun Enterprises.

Please review the claim. If you have any questions, or require additional information, please call me.

Please contact me after your review this claim to work out resolution and meeting details.

Sincerely,
LYNX CONSTRUCTION & CONSULTING, LLC

Lyn R. Farley
President

*Cc: Rick Levesque, Casie cde Baca*

4005 Palmer Ridge Drive, Parker, Colorado 80134
Phone: 303-840-7719 • Facsimile: 720-842-5035 • E-Mail: Lyn@Lynxconstruction.com

## I. Engagement and Investigation

At the request of Western Sun Enterprises and The Hartford Insurance Company, LYNX CONSTRUCTION & CONSULTING, *LLC* ("LYNX") performed an evaluation of two projects, RFP 554-58-03 and RFP 554-59-03 under contract with the U.S. Department of Veterans Affairs. Our work included a review of project documents and discussions with individuals involved in the construction.

LYNX reserves the right to consider any materials obtained after submission of this report and to modify this is report as necessary.

## II. Documents

Documents reviewed include:

- Correspondence to and from:
    - The VA Medical Center
    - Western Sun Enterprises
- Project Documents
    - RFP Solicitation
    - Change Order Requests
    - Drawings
    - Job conference reports
    - Assorted project records

## III. Summary

Western Sun Enterprises ("Western") and its Surety, The Hartford Insurance Company ("Hartford") make claim against U.S. Department of Veterans Affairs ("VA") in the amount of $508,592.96 (not including interest or attorney and consulting fees after construction) for compensation for additional work caused by differing conditions on Contracts between the parties.

On or about September 15, 2003, the VA solicited two bids for work at the Veterans Affairs Medical Center located at 1055 Clermont Street, Denver, Colorado.

The scope of work for one proposal was to provide a bid for all labor, tools, equipment, materials and supervision to complete all work for Design Services necessary to either to replace and abate ACM or install new and encapsulate existing ACM steam and condensate system and associated underground piping between the Building 8 Boiler Plant and Building 1 Sub-basement. This project was later known as the Steam & Condensate Contract.

The second proposal was similar in nature. Its scope of work requested a design-build proposal to provide all labor, tools, equipment, materials, and supervision, to complete all work necessary to provide domestic water heat exchangers in various locations and to supply water supply headers for domestic hot, cold and recirculation water piping for the 8th and 9th floors of Building #1. This project was later known as the Hot Water Contract.

The Solicitations were identical except for the scope of work. The VA furnished, as part of the proposal, a narrative describing the work, limited drawings, contract duration, estimated cost range, a statement for the VA to partner with the Contractor to resolve issues, Davis Bacon Wage Decision information and VA General Conditions. In addition, these two contracts were small business set aside.

Western was a registered small business contractor, who had performed work at the VA for approximately six years on a wide variety of projects, which included projects performed without interrupting the operating facility. Western obtained a copy of the Solicitations for the two projects referenced above, and began to review the work and determine what resources were necessary to provide a bid and then if successful, perform the work. These Solicitations contained more mechanical work than previous projects performed by Western. Western quickly determined it required additional expertise if it were going to make a preliminary plan, price out the work, and then perform the work. As a result, Western engaged the Services of M-E Engineering, Inc., ('M-E"). M-E is a design engineering company specializing in mechanical and electrical design. The have offices in Colorado, California, and London, England with an annual volume of approximately $25,000,000 per year.

Together, Western and M-E reviewed the solicitation and existing site conditions for both projects. Based upon the quick review, M-E and Western arranged a meeting to tour the site and meet with the VA.

Meanwhile, M-E finished design sketches that showed enough details for Western to determine labor, material, equipment, subcontractor, and design costs to provide the work according to the underground concept. Western had roughly estimated a price and went to the site with thoughts in

mind to verify the sketched design, and to identify any other issues that may cause the price to increase, and then complete the estimate.

At a meeting following a tour of the site, the VA's Contracting Officer Technical Representative ("COTR"), Mr. Grant Sylvester, provided his views, which were to abandon the concept of using existing underground structures and routing, and then change to an aboveground routing for the steam & condensate lines supported by a new structural system.

Both Western and M-E were caught off guard with Mr. Sylvester's approach. M-E agreed to modify a few sketches and Western immediately began to revise quantities and pricing to match the new overhead routing.

Following the site tour, M-E wrote a memo on September 4, 2003, outlining the design options in some detail. Western transmitted the memo to the VA Contracting Officer, Margie M. Nation, at the VA for information. Ms. Nation asked Mr. Sylvester to review the memo, and on September 9, 2003, Mr. Sylvester responded to Ms. Nation that Contracting should inform Western to proceed with the proposal using above ground routing design approach.

The site tour and conversations with Mr. Sylvester did not substantially change the Scope of Work as presented in the original Hot Water Solicitation. Western submitted a bid for $243,032.00.

Western submitted a price for Steam & Condensate, over $800,000.00, predicated upon the information provided by Mr. Sylvester and a very rough overhead routing concept.

Shortly after the bids were submitted, Western was summoned to a meeting with Ms. Nation to review the proposal, including pricing and construction.

At the meeting, Western informed Ms. Nation of the changes verbally made during the bidding process by Mr. Sylvester and then described in some detail of the changes that were priced into the proposal. Ms. Nation informed Western the Steam & Condensate bid price was too costly for the VA budget, and then opened a discussion with Western to perform the work at a lesser initial cost, and then issue change orders for the balance during the Contract. Ms. Nation confided in Western of the necessity to have an award by September 30, 2003, to use or loose, funding allocated in the fiscal year.

At the conclusion of the meeting, Western agreed to provide an overhead system based upon Ms. Nation's plan, and Ms. Nation agreed to work with Western and not let Western get hurt. Western took Ms. Nation at her word and provided her with a schedule of values with underground quantities and overhead engineering, which was approximately half the amount Western originally submitted.

There was a casual conversation about the Hot Water bid, which Western had submitted according to the proposal for an amount suitable to the VA.

Ms. Nation converted the Steam & Condensate Solicitation into an Award at an Offer price of $443,674.90, without modification to the original Scope of Work. Both parties executed the document on September 30, 2003.

Similarly, the Hot Water Solicitation was converted into an Award at an Offer price of $243,032.00, and both parties executed these documents on September 24, 2003.

Notice to proceed was issued to begin design on September 30, 2003. Western notified M-E to begin design work using the overhead approach and at the same time, requested additional documentation, meaning as-built drawings for the existing facility, from the VA. The VA was slow in providing as-built drawings, which in turn slowed down the design as documented by M-E in its letter of January 4, 2004.

By November 13, 2003, M-E had produced 65% drawings for VA review. On November 21, 2003, Ms. Nation responded to earlier Western correspondence: *"Due to the design build aspect of this project and the unavailability of needed drawing for your proposal, you may go ahead and commence excavation work starting December 1, 2003. Please submit your proposal immediately upon visually clarifying what needs to be done"*. Western began excavation of existing trench box from Building 8 South and quickly discovered and unknown condition, lean concrete back fill over the existing trench box, and then discovered the presence of asbestos. Western provided proposals to remove the lean concrete back fill and to remove the asbestos. True to her word, Ms. Nations issued a change order increasing the Contract amount an extending the Contract duration.

Before any other substantial field work could be completed, Ms. Nation unexpectedly died in an automobile crash.

With Ms. Nation's death, Western was presented with a dilemma: On one hand Western had a Contract to construct an underground steam & condensate system, and on the other hand, Western had made a deal with Ms. Nation to receive additional funding through the change order process to use overhead routing to construct the steam and condensate system and already had the design well underway.

Through a series of meetings and drawing submissions, a routing concept was approved, which allowed use of existing underground trenches for the first fourth of the distance, and then provided a new structural steel support system for the remaining three fourths of the system. This routing plan nearly doubled the piping lengths when compared to the Solicitation concept of underground routing.

At same time new VA direction and other issues became problems. A Structural Designer had to be hired in addition to M-E to design the new overhead steel structure to support the rerouted piping. Now that the piping was exposed, the dense fiberglass insulation had to be protected with aluminum cladding. Even though the Solicitation Documents stated all work would be performed between 7:00 AM and 5:00 PM, Western was forced to work off hours and week-ends on premium time to install bracing along building walls to support the rerouted piping. Other subcontractor costs increased. Pipe installation and welding costs increased because pipe had to be installed and welded nearly twenty feet in the air instead of in position on the ground or in a trench box.

Underground routing did not require pumping condensate, but the above ground routing did. Then the VA forced Western to design and install redundant pumping systems, which required two pumps instead of one per application and further increased the cost to Western.

Western submitted change orders for the additional work, which were rejected by the VA. As a final effort, Western gave notice to the VA of his agreement with Ms. Nation and attempted to provide supporting information to obtain additional funding. The newly appointed Contracting Officer, Ms. Jan Bertapelle-Anderson rejected Western's proposal and assertion the VA promised more that was written into the Contract. The VA forced Western to proceed with the design and construction of an overhead routed steam and condensate system without additional compensation even though the executed Contract Documents required an underground system.

The VA issued some minor changes; however, they were not nearly enough to set off the increasing costs from extensive work Western was performing under conditions beyond those listed in the Solicitation.

Western continued to work to complete the project until Western was out of funds and unable to finish the contract without additional funding. Hartford reacted to the February 10, 2005, demand from VA providing a substantial infusion of cash, which paid past due bills for labor, material, and equipment resources and allowed Western to complete the work.

Western and Hartford substantially completed the project.

## IV. Differing Site Conditions

The project records were clear as to the relevant conditions in Western's Contract. Article A.7 provided the following definitions:

A. Design-Build (DB) as defined by the Department of Veterans Affairs (VA) is the procurement by the Government, under one contract, with one firm or joint venture (JV) for both design and construction services for a specific project.

E. Design-Build (DB) as defined by the Department of Veterans Affairs (VA) is the procurement by the Government, under one contract, with one firm or joint venture (JV) for both design and construction services for a specific project.

The language in the Award, Article A1.I, clearly defined the Scope of Work contemplated.

A. Contractor shall design and build a new steam condensate system, replacing or paralleling the existing underground trench and associated piping, running from Bldg. 8 boiler plant to the sub-basement of Bldg. 1.

B. Work will include:

1. Installation of new underground steam and condensate mains, complete with new concrete trench with removable covers, pipe insulation, pipe hanger types LE; anchors, guides and expansion devices.

2. Use existing manholes if possible or install new for change of directions and low point condensate trap installation.

3. Run new exposed insulated steam and condensate mains in areas where the existing piping is exposed. Coordinate tie-ins to minimize downtime of the steam and condensate mains.

4. Preparation of asbestos containment/abatement plan and associated cost in the event that disturbance of the existing asbestos is inevitable.

The language in the Award, Article A1.II, and Phase II continues:

> Resurface all areas disturbed by construction including but not limited to concrete, asphalt, grass, and gravel.

These cites provide the basis for the Design Build Contract. Western executed one contract to perform design work and construction work. The concept in the contract was to design a new underground steam condensate system, replacing or paralleling the existing underground trench from Bldg. 8 Boiler Plant to the Sub-basement of Building 1.

The VA's insistence to design and construct an overhead steam and condensate system in lieu of the underground system contracted by the VA represented a change in conditions (VAAR § 52.236-2) to the Contract.

The schematic design concept, which was finally adopted, required steam and condensate pipes be placed in an existing underground concrete trench box that extended south from Building 8 Boiler Room, around of the Maintenance Building the edge of 11th Street. From there, the pipe ran on a steel structure constructed over 11th Street, continuing to Building 24, and then along Building 1 to an inside corner, vertically up two stories to the roof, across the roof to a mechanical chase, and then down four stories to the sub-basement of Building 1.

This design required additional work to support the steam and condensate system. Piping had to be supported by a new steel structure from the end of the existing concrete trench box to Building 1 Sub-Basement. An "A" frame support was constructed to support vertical piping from the trench box to the side of the Maintenance Building. Steel knee braces were fabricated and bolted onto the Maintenance Building walls to support the piping work. At the edge of the Maintenance Building, a steel bridge was constructed over sidewalks and 11th Street to the edge of Building 24. Knee braces were through bolted on Building 24 and Building 1 to support pipe from the end of the bridge to the inside corner adjacent to the loading docks at Building 1. From there, the pipes were installed vertically on steel supports, to reach the roof at the third story level. Pipes were laid diagonally across the roof on steel supports toward a mechanical chase. Finally, pipes were installed on a steel support system down the existing chase to Building 1 Sub-basement, where they were connected to the existing steam and condensate system.

The design of the supporting steel structure required Western to retain a Structural Engineer to fully design a structure capable of supporting the piping systems. Knee braces were designed for use along existing buildings using and anchoring system to attach the knee braces to the brick structures. Similar braces were used to support the piping system vertically. A supporting system for the roof was devised to support the pipe and allow expansion. These roof braces were attached to the underlying roof structure. That meant a penetration to the existing membrane roof was necessary at

each support point. The construction of the supporting structure and piping system were more costly than excavation, backfill, and resurfacing required using existing concrete trenches. Additional lifting equipment for men and material was required to install the support brackets, pipe and insulation. The production rate to install and weld the piping work twenty feet off the ground, in position on the steel structure was significantly less than that required to install piping work in existing trenches. During knee bracket installation, Western was forced to change anchorage from "drill in" to 'through the wall" because of unknown existing deteriorated conditions. Instead of drilling around four inches and inserting an anchor, Western had to drill about eighteen inches and then have personnel inside the building as well as on the lift to install the through bolts and braces. Abruptly, and contrary to the Contract Documents, the VA required this installation work be performed off hours and on week-ends on premium time.

Western encountered additional differing conditions when it discovered lean concrete backfill instead of compacted soil or gravel on existing trenches. Western was paid to remove and dispose of the lean concrete, but was not paid to purchase new gravel backfill.

The approved route required condensate pumps not required in underground routing. The VA forced Western to design redundant pumping systems. As a result, Western had to provide second pump for every application. Western had to provide a second piping system from the main to the pump and back to the main. The piping had to be insulated and covered with a protective cladding. Western had to the purchase a stand-by pump and then contract for pump installation. Western also had to provide an electrical starter and wiring, and then control. Now the control system had to alternate pump operation and report failure for two pumps instead of one. This new VA condition affected both projects. Four extra condensate pumps, with two tanks, piping and insulation were required on the Steam and Condensate project. Two Variable Frequency Drive water pumps, piping and insulation were required on the Hot Water project. Next the VA added a control requirement to announce alarms in its central control room in additional the local alarms. monitoring, and annunciation system. This VA decision affected all pump systems both projects. All of this additional work was a change in conditions to the original Contract.

## V. Discussion

This project had mistakes by all parties. In the end, Western was irreparably damaged due to actions by the VA.

According to Western, Ms. Nation wanted an award to capture and not loose funding appropriated in that fiscal year and bent the contracting process to achieve that goal. That explains why Ms. Nations did not alter the Scope of Work for the reduced price, when she actually purchased an underground steam and condensate system, which was estimated at approximately half the overhead cost by Western.

Western proceeded with design and construction of an overhead steam and condensate system based upon his agreement with Ms. Nations, in spite of the actual language in the Contract. At the beginning of the project, Ms. Nations gave every indication of following her verbal agreement, and that observation is supported by her "let me know" letter of November 24, 2003.

When Ms. Nation died, Western advised the VA of the agreement with Ms. Nation. Western thought there would be notes in the file to support his story and work would continue according to the agreement with Ms. Nation.

When Western advised the new Contracting Officer, Jan Bertapelle-Anderson of the actual deal and the cost overruns, Ms. Bertapelle-Anderson should have stopped work and carefully reviewed the Contract Documents. That did not occur. There were no partnering sessions or negotiating sessions to work out a reasonable solution. Instead the VA unilaterally responded there was no merit for additional funding, and further that, Western was required to complete the Contract per the contract requirements. The VA completely forced its will onto Western when it VA forced Western to continue to construct an overhead steam & condensate system even though this scope was clearly beyond the terms of the Contract.

The letter went on to require other work beyond the scope of the Contract. Either Ms. Bertapelle-Anderson did not read the Contract, or she did not understand the Contract. In either case, Ms. Bertapelle-Anderson's response was incorrect and completely contrary to the tenants of fair dealing of partnering on a small business set aside contract.

When the VA responded and Western learned the VA had no intention of honoring Ms. Nations agreement, Western should have immediately stopped the work and advised the VA that Western would continue with work as contracted; that is, in strict compliance with the Contract Documents and construct an underground steam and condensate system. Unfortunately design and construction was too far along using the overhead design.

An underground steam and condensate system represented the only Scope of Work ever contracted by the VA.

At the same time Western was trying to work out issues with payment and scope between and overhead and underground system, the VA decided to enforce other standards beyond the requirements of the contract. There were no provisions in the Contract Documents to have redundant systems. Western and M-E concurred with the VA that a concurrent design was superior, but argued redundant systems were not part of the Solicitation and not included in the pricing of either Contract. The VA forced Western to install redundant systems.

The VA continued to force Western to implement an above ground routing, and to design and construct fully redundant pumping systems for water and condensate systems, which made it only a matter of time before Western could not perform. What the VA demanded Western to construct, cost more than twice the amount in the Contract. Western poured all its resources into the project. Western continually requested additional funding and the VA continually rejected the requests. As a result of lack of funding and being forced to perform work clearly outside of the Contract, Western was forced out of business by the VA.

In its prelude to default terminate Western; the VA issued three letters. On October 7, 2003, Ms. Bertapelle-Anderson sent a "Show Cause Notice" to Western notifying Western the Government was considering terminating the Contract for Western default for failure to pay subcontractors. Western responded on October 22, 2004 with the second letter describing his dealings with Ms. Nation. In addition, Western contended the project had taken twice as long that work had to be performed on

premium time not during normal working hours, that there were weather issues, and there was loss in productivity. The VA responded on December 17, 2004, summarily denying any additional compensation. The VA's letter provided a specific list of remaining work items:

1. Complete the 4" condensate piping to manhole at Building 6, approximately 25 feet, and remove the temporary 4" condensate above ground line from Building 6 to the Boiler Plant, approximately 100 feet.
2. Install Pura-Fill Insulation in trench from Building 6 to manhole, approximately 25 feet by 6 feet wide by 3 feet deep.
3. Backfill trench with flowable dry concrete mix, from Building 6 to Building 8, approximately 125 feet by 6 feet wide by 4 feet deep.
4. Repave asphalt over trench, approximately 125 feet by 7 feet wide by 6 inches thick.
5. Install waterproof housing at Building 1 and Building 6 for steam and condensate piping penetration points.
6. Install protective corrugated metal skin to steam and condensate piping above ground structural support system, approximately 300 feet by 4 feet on top, and 4 feet on one side.
7. Complete the electrical power and control wiring to 3 of the 4 new condensate pumps located in the subbasement of Building 1.

Items 2, 5, and 6 were determined not to be part of the contract during completion. Item 7 was an item in dispute. The Solicitation did not contain any requirements for redundant pumping or control systems. This work was performed under a reservation of rights during completion. Item 1 was predicated upon an outage, which was delayed by the VA well into completion. Item 4 could not be completed until items 1 and 3. There were no requirements in the Solicitation to furnish and install flowable concrete backfill; gravel backfill was provided but not paid by VA. This work was performed under a reservation of rights during completion.

On February 10, 2005, the VA issued its "Final Decision" notifying Western it was terminated. This letter reiterated the VA's denying previous Western requests and again recounted the same seven items above as work to complete.

Taken together, the narrative and completion list, it appears the VA did not refer to the Scope of Work in the Contract and in addition had a poor or misunderstanding of a Design-Build Contract. In any contract, the Scope of Work is the predicate for the work to be performed. Applied to this contract, the VA purchased an underground steam and condensate system and then required Western to design and construct an overhead steam and condensate system that required pumping systems. Then the VA required fully redundant pumping systems for the Steam and Condensate Contract as well as for the Hot Water Contract. Although both Solicitations indicated all work be performed during normal business hours; the VA forced Western to perform a majority of the work off hours at premium costs.

The VA's conduct with Western was akin to a class bully to a weakling, rather than a partner with a small business contractor. The record shows the VA never correctly understood what they purchased, but instead, forced Western to provide what they wanted regardless of the terms of the

Contract. The VA should have worked out the differences with Western instead of making unilateral decisions, which lead to a wrongful termination.

## VI. Conclusions

1. Western was advised by the VA to submit a bid to construct an overhead steam and condensate system.
2. Western submitted a bid exceeding $800,000 to the VA.
3. VA rejected that bid.
4. VA entered into a Contract for the original Solicitation Scope of Work at roughly half the original offer price.
5. Ms. Nations died without disclosing any facts, other than the executed Contract Documents.
6. Western advised Ms. Nation's replacement, Ms. Bertapelle-Anderson of verbal agreements made between Ms. Nation and Western.
7. Ms. Bertapelle-Anderson rejected Western's story and refused additional funding, while at the same time demanding Western complete its work according to Contract.
8. Ms. Bertapelle-Anderson was in error because the work forced upon Western was more than was required by the terms of the Contract.
9. The VA imposed requirements beyond the terms of the Contact onto Western.
10. There VA made no direct attempt and there were no partnering sessions to work out a reasonable solution.
11. Western's work was dramatically increased.
12. Most of Western's work was performed under changed conditions.
13. Western was forced to work off hours and week-ends at premium costs.
14. Western's productivity to install the supporting structure and piping system overhead was substantially less that it would have been to install in existing trenches.
15. Western was wrongfully terminated.
16. The Surety should recover all costs incurred to complete.
17. Western is entitled for recovery for costs for work above the requirements of the Contract.

## VII. Damage Calculations

Western and Hartford are seeking damages based upon a modified total cost approach. This approach was used because the nature and extent of the impacts, and then to assess the impacts to the proper project, make it highly impracticable to otherwise determine the damages to a reasonable degree of accuracy.

Adjustments were made to the Western and Hartford completion costs to remove those costs such as corrective work and clean-up. This was accomplished by using an estimate.

LYNX CONSTRUCTION & CONSULTING, *LLC*

Lyn R. Farley
President

# VIII. Damages

| | |
|---|---|
| Total Western Cost *(before Termination)* | 702,062.15 |
| Hartford Completion Costs | 364,916.04 |
| Western Completion Costs | 33,671.00 |
| Bond Costs | 17,295.92 |
| Insurance Cost | 19,564.04 |
| Total Cost | 1,137,509.15 |
| Less Payments to Western | (660,174.43) |
| Less Payments to Hartford | (180,612.99) |
| Shortfall | 296,721.73 |
| Western Overhead and Profit (Calculated) | 170,626.37 |
| Western Lost Profits | 50,000.00 |
| Western & Hartford Damages | 517,348.10 |
| Adjustment for Western & Hartford Costs | (18,000.00) |
| Damages Sought By Western & Hartford | 499,348.10 |
| Late Payment Interest at 18% through May 1 | 113,344.60 |
| Approximate Legal Fees | 25,000.00 |
| Total Damages, Interest and Legal Fees | 637,692.69 |

| | Steam | Hotwater | Total |
|---|---|---|---|
| Damage Allocation | 365,197.10 | 84,151.00 | 449,348.10 |
| Western Lost Profit Allocation | 40,996.97 | 9,003.03 | 50,000.00 |
| Interest Allocation | 92,935.70 | 20,408.90 | 113,344.60 |
| Consulting & Legal Allocation | 20,500.00 | 4,500.00 | 25,000.00 |
| Total | 519,629.76 | 118,062.93 | 637,692.69 |

The documents that form the basis of this claim are referenced within the claim narrative and reside as part of the VA records for this project.

Certifications are attached.

**Western Sun Enterprises, Inc.**
*General Contractors*

May 7, 2007

Raymond Tomori
Contracting Officer
U.S. Dept. of Veterans Affairs
VA ECH Medical Center/FMS-138
1055 Clermont St.
Denver, CO 80220-3808

Re: Contract: V554C-838 Design/Build Steam & Condensate
VA ECHS Medical Center, Denver, CO

Dear Mr. Tomori:

This letter serves as the Certification on behalf of Western Sun Enterprises, Inc. in support of its claim for additional compensation on above-referenced Contract. I hereby certify as follows:

1. That the claim is made in good faith;

2. The supporting data are accurate and complete to the best of my knowledge and belief;

3. The amount requested accurately reflects the contract adjustment for which the Contractor (Western Sun Enterprises, Inc.) believes the Government is liable; and

4. I am duly authorized to certify the claim on behalf of the Contractor.

This Certification is in compliance with FAR 52.233-1(2)(iii). The attached claim/report prepared by Lynx Construction and Consulting is attached and fully incorporated into this Certification.

Sincerely,

Casie Cde Baca
Authorized Representative of Western Sun Enterprises, Inc.

Enclosure

**Western Sun Enterprises, Inc.**
*General Contractors*

May 7, 2007

Raymond Tomori
Contracting Officer
U.S. Dept. of Veterans Affairs
VA ECH Medical Center/FMS-138
1055 Clermont St.
Denver, CO 80220-3808

Re: Contract: V554C-839 Design/Build Hot Water Heaters
VA ECHS Medical Center, Denver, CO

Dear Mr. Tomori:

This letter serves as the Certification on behalf of Western Sun Enterprises, Inc. in support of its claim for additional compensation on above-referenced Contract. I hereby certify as follows:

1. That the claim is made in good faith;

2. The supporting data are accurate and complete to the best of my knowledge and belief;

3. The amount requested accurately reflects the contract adjustment for which the Contractor (Western Sun Enterprises, Inc.) believes the Government is liable; and

4. I am duly authorized to certify the claim on behalf of the Contractor.

This Certification is in compliance with FAR 52.233-1(2)(iii). The attached claim/report prepared by Lynx Construction and Consulting is attached and fully incorporated into this Certification.

Sincerely,

Casie Cde Baca
Authorized Representative of Western Sun Enterprises, Inc.

Enclosure

11590 Jackson Street • Thornton, CO 80233

# Lyn R. Farley

*EDUCATION:*

B.S. Civil Engineering, 1974, University of Missouri - Rolla.
Registered Professional Engineer - Missouri.
License General Contractor in California (B-1)
Certified Surface Mine Supervisor, Department of Mines and Minerals, State of Illinois.
Certified Shaft and Slope Supervisor Underground Construction, Department of Mines and Minerals, State of Illinois.

*EXPERIENCE:*

| | | |
|---|---|---|
| *2002 to Present* | *LYN X CONSTRUCTION & CONSULTING, LLC.*<br>*(Merger of Saguaro Construction, Inc. and The Construction Analyst)* | *President*<br>*Consultant* |
| *1995 to 2002* | *Saguaro Construction, Inc.* | *President* |
| *2000 to 2002* | *The Construction Analyst* | *President*<br>*Consultant* |
| *1991 to 2000* | *Sage Construction Consulting*<br>*formerly FORCON International* | *Consultant* |
| *1983 to 1991* | *Alberici / Denver Inc.*<br>*(Subsidiary of Alberici Corp.)* | *CEO Vice President*<br>*Operations* |
| *1979 to 1983*<br>*1974 to 1976* | *J.S. Alberici Construction Co., Inc.* | *Project Manager*<br>*Project Engineer*<br>*Estimator* |
| *1976 to 1979* | *Gunther Nash Mining Construction Co.*<br>*(Subsidiary of Alberici Corp.)* | *Project Manager* |
| *1972 to 1973* | *E. T Simonds Construction Co. Inc.* | *Field Engineer* |
| *1971 to 1972* | *Crawford and Whiteside Civil Engineers* | *Engineering*<br>*Tech* |
| *1970 to 1971* | *Department of Transportation, State of Illinois* | *Engineering*<br>*Tech* |

***As President:***

Day to day management of the company which specializes in negotiated design--build contracts including:

- Construction Management and Execution
- Contract Negotiation
- Estimating & Budgeting
- Value Engineering and Constructability
- Client & Subcontractor Relations
- Master Scheduling

***As Consultant:***

Handling Surety and Construction Claims throughout the United States including:

- Litigation Support
- Claim Development and Analysis
- Investigative Services on Property, Development, Environmental and Construction Disputes
- Construction Management for Completion Work
- Expert Witness

***As CEO Vice President:***

Complete operational and administrative responsibility for the Denver, Colorado branch office and construction of over seventy-five projects in hotels, commercial buildings, and manufacturing facilities including;

- Construction Management and Execution
- Design Build
- General Contracts
- Estimating
- Value Engineering and Constructability
- Client Relations - Corporate Level
- Subcontractor Relations - Corporate Level

The staff was over thirty including project managers, support engineers, estimators, architectural and engineering designers, accountants, and clerks, to complete as many as fourteen projects per year exceeding fifty million dollars volume per year.

- Design/Build a 229,000 sf non-nuclear manufacturing facility, with office and laboratory; Rockwell International-Department of Energy, Rocky Flats, Colorado.
- 65 hotels: Marriott Courtyard, The Residence Inn, Hampton Inn, and Radisson Hotel Corp., apartments, and condominiums, located in 24 states.
- 6 Target Stores; Dayton Hudson Corporation, Denver, Colorado.
- May D & F Store; May Department Stores, Colorado Springs, Colorado.
- SST Building, Martin Marietta Corporation; Lakewood, Colorado.
- Engineering Buildings A & B, Martin Marietta Corporation; Lakewood, Colorado.
- Silverthorne Outlet Mall; Silverthorne, Colorado
- Design/Build of a 250,000 sf refrigerated storage, office, and truck shop, Anheuser-Busch; Denver, Colorado.
- Beer Packaging and Storage Building, Anheuser-Busch; Ft. Collins, Colorado.
- Construction of the Graduate Student Apartments, University of California, Irvine, California.

***As Project Manager:***

Responsibility for planning, programming, and supervising the projects assigned. Duties include working directly with the owner/customer in planning the work to assure cost effective and Constructability design, proper interface and turnover. Supervised scheduling, estimating, contract administration, construction, and completion of the following projects:

- Site and foundation work, Sierra Program, Ford Motor Company, Hazelwood, Missouri.
- Roof rehabilitation, Stacy Park Reservoir, City of St. Louis, St. Louis, Missouri.
- 3000 TPD Lead Concentrate Producing Grinding and Milling Plant, ASARCO, Bunker, Missouri.

- Erection of precipitators and ductwork for Units 1-4, Union Electric, Meramec Station.
- Installation of raw coal stacking system, Zeigler Coal Company, Coulterville, Illinois.
- Erection of 5000 foot overland belt conveyor, Zeigler Coal Company, Coulterville, Illinois.
- Addition of fine coal cleaning circuit, Zeigler Coal Company, Johnston City, Illinois.
- Maintenance of man and material, production, and ventilation shafts, Virginia Pocahontas Division, Island Creek Coal Company, Vansant, Virginia.
- Erection of an automatic coal sampling system, Bethlehem Coal Company, Fairmont, West Virginia.
- Erection of a 100 TPH Coal Preparation Plant, Westbury Coal Company, Richlands, Virginia.
- Replacement of 13,000 tubes in a B&W Air heater, Union Electric, Portage des Sioux Station.
- Erection of a $NASO_2$ scrubber, Pfizer Chemical Company, East St. Louis, Missouri.

***As Project Engineer:***

Responsible to the Project Manager for planning, scheduling, layout, estimating, and directly supervising all field work on jobs involving concrete and steel construction, process piping, and equipment installation:

- Construction of an Automated Barge Manufacturing Facility, St. Louis Ship, Caruthersville, Missouri
- Installation of process equipment to make Mainstay Dog Food, Ralston Purina, Clinton Iowa
- Erection of a Grit Handling System, Metropolitan Sewer District, St. Louis, Missouri

## Lyn R. Farley

*Testimony as an Expert Witness*

| Date | Case | On Behalf Of |
|---|---|---|
| 4/01 | U.S. District Court<br>Western District of MO.<br>Southern District<br>Case No. 94-3465-CV-S-4<br>Donald Maggi, Inc.<br>v.<br>C. Iber & Sons, et al<br><br>National Ben Franklin Insurance Co | National Ben Franklin Insurance Co. – surety of C. Iber & Sons (D) |
| | U.S. District Court<br>Eastern District of TN<br>Cumberland Surety Insurance Company, Inc.<br>v.<br>City of Ervin | Cumberland Surety & Insurance Co. (T) |
| 2/00 | AFT Inc.<br>v.<br>Porta-McCurdy Development Company LLC<br>Case No.: 58-110-00100-97 | AFT Inc. (T) |
| 11/00 | AFT Inc.<br>v.<br>Kromm, Rikimaru and Johansen, Inc. | AFT Inc. (T) |
| 2/01 | Centerre Construction, Inc.<br>v.<br>Wicks Lumber | Centerre Construction, Inc. (T) |
| 4/01 | Donald Maggi Construction Company<br>v.<br>National Ben Franklin Insurance of Illinois<br>Case No.: 57-110-007499 | National Ben Franklin Insurance Company (T) |
| 6/01 | Mid State Surety Corporation<br>v.<br>Montcalm County Drain Commission and Earth Tech, Inc. | Mid-State Surety (D) |
| 6/02 | Mid State Surety Corporation<br>v.<br>Western Surety Company<br>And<br>Salameh Bros. Construction Co.<br>16 110 00607 1 | Mid-State Surety (T) |
| 2/02 | Mid State Surety Corporation<br>v.<br>Madigan Construction Company | Mid-State Surety (D) |

| | | |
|---|---|---|
| | Paul W. and Carolyn Madigan<br>United State District Court for the District of Maryland<br>At Baltimore | |
| 3/02 | Willow Run Housing, LTD and<br>Willow Run Housing II, Inc.<br>v.<br>Construction Supervisors, Inc.<br>United Pacific Insurance Co.<br>And Reliance Insurance Co.<br><br>Case No. 70-11000S2000 | Willow Run Housing LTD (T) |
| 9/02 | Fireman's Fund Insurance Company<br><br>v.<br>Lumenyte International Corporation; George Shaffer Construction Company; Luckenbach/Ziegelman & Partners, Inc.; Michael Hazard Associates; Frontier Fire Protection, Inc.; BFPE; Gary Steffy Lighting Design, Inc.; Tyco Electronics Corporation and Tyco International Limited | Fireman's Fund Insurance Company (D) |
| 2/03 | Ace Tile Incorporated<br>v.<br>Raymond Williams Construction Company | Raymond Williams Construction Company (T) |
| 10/03<br>11/04 | In the United States District Court<br>For the District of New Mexico, El Paso Division<br>Belt Con Construction, Inc.<br>v.<br>Metric Construction Co., Inc., and Safeco Insurance Company of America<br>CIV 02-1398-JB/LAM | Belt Con Construction, Inc. (D)<br>Belt Con Construction, Inc. (T) |
| 4/04 | In the United States District Court<br>For the Western District of Pennsylvania<br>Mid-State Surety Corporation<br>v.<br>East Bethlehem Township Municipal Authority<br>And Gannett Fleming, Inc.<br>No.: 01-0240 | Mid-State Surety (D) |
| 4/04 | Superior Court of Arizona, County of Maricopa<br>The City of Phoenix<br>v.<br>Mid-State Surety Corporation and AMRA Construction Corporation<br>No.: CV2001-007139 | Mid-State Surety(D) |

"T" – cases in which testimony was given.
"D" – cases in which deposition was given.