# Affidavit of Mr. Lyn R. Farley

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HARTFORD FIRE INSURANCE COMPANY,

Plaintiff

v.

No. 07-774C

THE UNITED STATES,

Defendant.

**AFFIDAVIT OF LYN R. FARLEY**

I, Lyn R. Farley, declare as follows:

1. I am the President and consultant of LynX Construction and Consulting, LLC, a Colorado limited liability corporation located at 4005 Palmer Ridge Drive, Parker, Colorado 80134.
2. I was hired by the Hartford Fire Insurance Company ("Hartford") as a construction consultant regarding bond claims relating to U.S. Department of Veterans Affairs (the "VA"), Contract No. V5546-839-03-8(a) and V554C-838-03-8(a), hereinafter collectively referred to as the "Contracts".
3. As part of my engagement by Hartford, I assisted with drafting the takeover agreements executed between Hartford and the VA on October 4, 2005, regarding the Contracts.
4. On August 19, 2005, I received a letter from the VA's Contracting Officer, Mr. Raymond Tomori indicating claims for damages relating to the Contracts were not to be included in the takeover agreements and that such claims would be addressed

under supplement agreements issued by the VA after the execution of the takeover agreement. A copy of the VA's letter is attached hereto as **Tab 1**.

5. To the best of my knowledge, no supplement agreements were ever issued by VA regarding claims relating to the Contracts.

6. As part of my engagement by Hartford, I prepared a joint claim for Hartford and its principle, Western Sun Enterprises, Inc. ("Western"), hereinafter collectively referred to as the "Claimants".

7. I had numerous discussions with Mr. Tomori regarding the recovery of costs by the Claimants for changes in conditions and the scope of the Contracts.

8. During these discussions, I informed Mr. Tomori that the Claimants would be submitting a claim after the Contracts were complete.

9. Although I made Mr. Tomori aware of the fact that claims would be filed on behalf of Western and Hartford, he indicated he want on single claim to resolve all the issues relating to the Contracts and the takeover agreements.

10. Base on Mr. Tomori's guidelines, I prepared a modified total cost claim that incorporated Western's damages including payments made by Hartford.

11. On or about March 5, 2007, I submitted a draft of this claim on behalf of the Claimants to Mr. Raymond Tomori. A copy of the draft claim is attached hereto as **Tab 2**.

12. On or about March 13, 2007, Mr. Tomori responded to this draft claim, acknowledging the receipt of the Claimants jointly filed claim and specifically requesting that, "in order for the government to consider your request further, you

must file separate requests, including a dollar amount for each of the above-referenced contracts." A copy of the VA's letter is attached hereto as **Tab 3**.

13. I discussed the March 13, 2007 letter with Mr. Tomori at the time and he indicated that it was his intention for the Claimants to break the lump sum claim up between the two Contracts.

14. On or about May 16, 2007, I did submit on behalf of the Claimants a revised joint claim wherein the lump sum claim was divided between the two Contracts pursuant to Mr. Tomori's request.

15. On May 21, 2007, I received a letter from Mr. Tomori reiterating the instructions designated in his March 13, 2007 letter regarding the filing of two separate claims and requesting that "each separate claim must include specific or pertinent facts relating to that contract for which you are filing and the claim cannot be combined. The claim must include a dollar value associated for each point where you allege monetary damages incurred. Your claim must include documentation that supports the claim and your position." A copy of the VA's letter is attached hereto as **Tab 4**.

16. On May 21, 2007, I receive an e-mail correspondence from Mr. Ray Tomori indicating, "the claim must be separated and filed separately per contract with the allegations associated by that contract and not combined." A copy of the email is attached hereto as **Tab 5**.

17. During the time period between March 1 and July 1, 2007, I spoke to Mr. Tomori on the telephone and in person on numerous occasions regarding the Claimants' claim. At no time during any of these conversations did Mr. Tomori ever indicate that he

wanted the Hartford to file a claim separate from that of Western Sun Enterprises, Inc.

18. I personally met with Mr. Tomori at his office after his March 13, 2007 letter to discuss the VA's requirements for certifying the Claimants' claims. During this meeting, Mr. Tomori contacted the VA's attorney in California and base on that discussion he provided me with specific instructions and language to be used to certify the Claimants' claim.

19. Mr. Tomori indicated the certification had to be on Western's letterhead.

20. At no time did Mr. Tomori indicate to me that the Claimants' joint claim needed to be certified by both the Hartford and Western Sun Enterprises, Inc.

21. On or about April 4, 2008 was the first time I became aware that Mr. Tomori was requesting a separate claim certification be filed by Hartford.

22. On or about April 21, 2008, I did submit to the VA on behalf of the Hartford its claim certification document regarding the Claimants' joint claim. A copy of the amended certification is attached hereto as **Tab 6**.

23. I have personal knowledge of the facts in this declaration and I am competent to testify to the matters stated therein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2008.

[signature]

Lyn R. Farley

STATE OF COLORADO )
)ss.
COUNTY OF DENVER )

SUBSCRIBED AND SWORN TO before me this 21st day of April, 2008, by Lyn R. Farley.

My Commission Expires: 06/30/2010

SEAL

[signature]

Notary Public

# Farley Affidavit – Tab 1

**U.S. Department of Veterans Affairs**
**VISN 19 - Rocky Mountain Contracting**
**4100 East Mississippi Avenue**
**Suite 1110**
**Glendale, CO 80246**

August 19, 2005

Mr. Lyn R. Farley, President
Lynx Construction & Consulting, Inc
4005 Palmer Ridge Drive
Parker, CO 80134

Dear Mr. Farley:

Subject: The Hartford Insurance
Bond No. 37BCSBU9555/Claim No. 564 S 24961,
VA Contract V554C-839, Replace Hot Water Heaters
Bond No. 37BCBU9556/Claim No. 564 S 24961,
VA Contract V554C-838, Replace Steam & Condensate
ECHS (VA Medical Center), Denver, CO

Thank you for your recent letters addressing scope and outstanding change orders discussed in our meeting of July 14, 2005. The Governments response is limited to topics related to successful completion of the project as required by the Surety. Therefore, statements regarding liability and interpretations of the contract will not be addressed. It is our understanding that Western Sun intends to seek relief as provided under their rights of the contract and by law. The Surety Takeover Agreement is not the appropriate venue to address those allegations.

The Government will provide the Request for Proposals for both projects to Lynx the week of August 22, 2005. The solicitations and resultant contracts contain narratives of the intention of the projects. However, the statement "there are no criteria specifications or drawings provided with the solicitation for bids" is not correct. Both were issued as a design build; therefore, it is the responsibility of the contractor to develop detailed specifications in accordance with the VA specifications and standards required in the contract. Your attention is directed to Section 01001-13, Paragraph J, Design Requirements – Compliance with Codes and Standards. This section directs the contractor to the website in which those design requirements can be located in order to successfully complete the project. The Government shall expect the Surety to be in full compliance with those requirements.

Hartford Insurance and the Government are working towards execution of the Surety Takeover Agreement which is anticipated to be completed by the end of the week of August 22, 2005. We have received the tentative construction schedule from you. This was the only issue remaining for incorporation into the Surety Takeover Agreement prior to execution.

The Government has received the schedule and is in agreement with completion within sixty (60) calendar days after issuance of the Notice to Proceed.

The Supplemental Agreements for additional compensation for changes submitted by Western Sun prior to contract termination will be issued after execution of the Surety Takeover Agreement. Those Supplemental Agreements are those the Government agrees are appropriate for times for delay when shutdowns did not occur, clean up, etc. The Supplemental Agreements issued from execution of the Surety Takeover Agreement will reflect Hartford Insurance as the prime. As a reminder, all future changes that may occur as part of the construction process will be addressed in accordance with the Changes clause of the contract.

In regards to those changes as outlined in your letter of July 25, 2005, the Government does not wish to pursue the pura-fill insulation, flowable concrete or the metal siding enclosures over the steam and condensate piping. Work associated with those areas of the backfill shall be done in accordance with industry standards and any VA specifications located at the website cited in the contract. The Government request you provide information as to the type of piping used for the outside steam and condensate piping to ensure that the material furnished and installed by Western Sun is that recommended by the manufacturer for the intended use.

As you are aware, the Government did not direct Western Sun to proceed with the current installation of the condensate piping. Rather, this was proposed by Western Sun during negotiations. The Government accepted this method with the understanding the intended functional end performance will not change.

In regards to the additional cost associated with temporary condensate lines the following explanation is provided. Under a design built contract, it is the Contractor's responsibly to determine the methods and phasing to successfully complete a project. Providing temporary condensate line should have been part of the project and taken into consideration in the Contractor's proposal. Any work remaining associated with this issue shall be accomplished through the Surety Takeover Agreement.

A pre-construction conference shall be scheduled upon execution of the Surety Takeover Agreement for review of the contract requirements. Please call me at 303-691-6543 with any questions you may have related to the projects.

Sincerely,

Raymond Tomori
Contracting Officer

cc: Rick Levsque, The Hartford

# Farley Affidavit – Tab 2

## I. Engagement and Investigation

At the request of Western Sun Enterprises and The Hartford Insurance Company, LYNX CONSTRUCTION & CONSULTING, *LLC* ("LYNX") performed an evaluation of two projects, RFP 554-58-03 and RFP 554-59-03 under contract with the U.S. Department of Veterans Affairs. Our work included a review of project documents and discussions with individuals involved in the construction.

LYNX reserves the right to consider any materials obtained after submission of this report and to modify this is report as necessary.

## II. Documents

Documents reviewed include:

- Correspondence to and from:
    - The VA Medical Center
    - Western Sun Enterprises
- Project Documents
    - RFP Solicitation
    - Change Order Requests
    - Drawings
    - Job conference reports
    - Assorted project records

Privileged & Confidential
Final Draft for Submittal

## III. Summary

Western Sun Enterprises ("Western") and its Surety, The Hartford Insurance Company ("Hartford") make claim against U.S. Department of Veterans Affairs ("VA") in the amount of $561,278.54 (not including interest or attorney and consulting fees after construction) for compensation for additional work caused by differing conditions on Contracts between the parties.

On or about September 15, 2003, the VA solicited two bids for work at the Veterans Affairs Medical Center located at 1055 Clermont Street, Denver, Colorado.

The scope of work for one proposal was to provide a bid for all labor, tools, equipment, materials and supervision to complete all work for Design Services necessary to either to replace and abate ACM or install new and encapsulate existing ACM steam and condensate system and associated underground piping between the Building 8 Boiler Plant and Building 1 Sub-basement. This project was later known as the Steam & Condensate Contract.

The second proposal was similar in nature. Its scope of work requested a design-build proposal to provide all labor, tools, equipment, materials, and supervision, to complete all work necessary to provide domestic water heat exchangers in various locations and to supply water supply headers for domestic hot, cold and recirculation water piping for the 8th and 9th floors of Building #1. This project was later known as the Hot Water Contract.

The Solicitations were identical except for the scope of work. The VA furnished, as part of the proposal, a narrative describing the work, limited drawings, contract duration, estimated cost range, a statement for the VA to partner with the Contractor to resolve issues, Davis Bacon Wage Decision information and VA General Conditions. In addition, these two contracts were small business set aside.

Western was a registered small business contractor who had performed work at the VA for approximately six years on a wide variety of projects, which included projects performed without interrupting the operating facility. Western obtained a copy of the Solicitations for the two projects referenced above, and began to review the work and determine what resources were necessary to provide a bid and then if successful, perform the work. These Solicitations contained more mechanical work than previous projects performed by Western. Western quickly determined it required additional expertise if it were going to make a preliminary plan, price out the work, and then perform the work. As a result, Western engaged the Services of M-E Engineering, Inc., ('M-E"). M-E is a design engineering company specializing in mechanical and electrical design. The have offices in Colorado, California, and London, England with an annual volume of approximately $25,000,000 per year.

Together, Western and M-E reviewed the solicitation and existing site conditions for both projects. Based upon the quick review, M-E and Western arranged a meeting to tour the site and meet with the VA.

Meanwhile, M-E finished design sketches that showed enough details for Western to determine labor, material, equipment, subcontractor and design costs to provide the work according to the underground concept. Western had roughly estimated a price and went to

Privileged & Confidential
Final Draft for Submittal

the site with thoughts in mind to verify the sketched design, and to identify any other issues that may cause the price to increase, and then complete the estimate.

At a meeting following a tour of the site, the VA's Contracting Officer Technical Representative ("COTR"), Mr. Grant Sylvester, provided his views, which were to abandon the concept of using existing underground structures and routing, and then change to an aboveground routing for the steam & condensate lines supported by a new structural system.

Both Western and M-E were caught off guard with Mr. Sylvester's approach. M-E agreed to modify a few sketches and Western immediately began to revise quantities and pricing to match the new overhead routing.

Following the site tour, M-E wrote a memo on September 4, 2003, outlining the design options in some detail. Western transmitted the memo to the VA Contracting Officer, Margie M. Nation at the VA for information. Ms. Nation asked Mr. Sylvester to review the memo, and on September 9, 2003, Mr. Sylvester responded to Ms. Nation that Contracting should inform Western to proceed with the proposal using above ground routing design approach.

The site tour and conversations with Mr. Sylvester did not substantially change the Scope of Work as presented in the original Hot Water Solicitation. Western submitted a bid for $243,032.00.

Western submitted a price for Steam & Condensate, over $800,000.00, predicated upon the information provided by Mr. Sylvester and a very rough overhead routing concept.

Shortly after the bids were submitted, Western was summoned to a meeting with Ms. Nation to review the proposal, including pricing and construction.

At the meeting, Western informed Ms. Nation of the changes verbally made during the bidding process by Mr. Sylvester and then described in some detail of the changes that were priced into the proposal. Ms. Nation informed Western the Steam & Condensate bid price was too costly for the VA budget, and then opened a discussion with Western to perform the work at a lesser initial cost and then issue change orders for the balance during the Contract. Ms. Nation confided in Western of the necessity to have an award by September 30, 2003, to use or loose, funding allocated in the fiscal year.

At the conclusion of the meeting, Western agreed to provide an overhead system based upon Ms. Nation's plan, and Ms. Nation agreed to work with Western and not let Western get hurt. Western took Ms. Nation at her word and provided her with a schedule of values with underground quantities and overhead engineering, which was approximately half the amount Western originally submitted.

There was a casual conversation about the Hot Water bid, which Western had submitted according to the proposal for an amount suitable to the VA.

Ms. Nation converted the Steam & Condensate Solicitation into an Award at an Offer price of $443,674.90, without modification to the original Scope of Work. Both parties executed the document on September 30, 2003.

Privileged & Confidential
Final Draft for Submittal

Similarly, the Hot Water Solicitation was converted into an Award at an Offer price of $243,032.00, and both parties executed these documents on September 24, 2003.

Notice to proceed was issued to begin design on September 30, 2003. Western notified M-E to begin design work using the overhead approach and at the same time, requested additional documentation, meaning as-built drawings for the existing facility, from the VA. The VA was slow in providing as-built drawings, which in turn slowed down the design as documented by M-E in its letter of January 4, 2004.

By November 13, 2003, M-E had produced 65% drawings for VA review. On November 21, 2003, Ms. Nation responded to earlier Western correspondence: "*Due to the design build aspect of this project and the unavailability of needed drawing for your proposal, you may go ahead and commence excavation work starting December 1, 2003. Please submit your proposal immediately upon visually clarifying what needs to be done*". Western began excavation of existing trench box from Building 8 South and quickly discovered and unknown condition, lean concrete back fill over the existing trench box, and then discovered the presence of asbestos. Western provided proposals to remove the lean concrete back fill and to remove the asbestos. True to her word, Ms. Nations issued a change order increasing the Contract amount an extending the Contract duration.

Before any other substantial field work could be completed, Ms. Nation unexpectedly died in an automobile crash.

With Ms. Nation's death, Western was presented with a dilemma: On one hand Western had a Contract to construct an underground steam & condensate system, and on the other hand, Western had made a deal with Ms. Nation to receive additional funding through the change order process to use overhead routing to construct the steam and condensate system and already had the design well underway.

Through a series of meetings and drawing submissions, a routing concept was approved, which allowed use of existing underground trenches for the first fourth of the distance, and then provided a new structural steel support system for the remaining three fourths of the system. This routing plan nearly doubled the piping lengths when compared to the Solicitation concept of underground routing.

At same time new VA direction and other issues became problems. A Structural Designer had to be hired in addition to M-E to design the new overhead steel structure to support the rerouted piping. Now that the piping was exposed, the dense fiberglass insulation had to be protected with aluminum cladding. Even though the Solicitation Documents stated all work would be performed between 7:00 AM and 5:00 PM, Western was forced to work off hours and week-ends on premium time to install bracing along building walls to support the rerouted piping. Other subcontractor costs increased. Pipe installation and welding costs increased because pipe had to be installed and welded nearly twenty feet in the air instead of in position on the ground or in a trench box.

Underground routing did not require pumping condensate, but the above ground routing did. Then the VA forced Western to design and install redundant pumping systems, which required two pumps instead of one per application and further increased the cost to Western.

Privileged & Confidential
Final Draft For Submittal

Western submitted change orders for the additional work, which were rejected by the VA. As a final effort, Western gave notice to the VA of his agreement with Ms. Nation and attempted to provide supporting information to obtain additional funding. The newly appointed Contracting Officer, Ms. Jan Bertapelle-Anderson rejected Western's proposal and assertion the VA promised more that was written into the Contract. The VA forced Western to proceed with the design and construction of an overhead routed steam and condensate system without additional compensation even though the executed Contract Documents required an underground system.

The VA issued some minor changes; however, they were not nearly enough to set off the increasing costs from extensive work Western was performing under conditions beyond those listed in the Solicitation.

Western continued to work to complete the project until Western was out of funds and unable to finish the contract without additional funding. Hartford reacted to the February 10, 2005, demand from VA providing a substantial infusion of cash, which paid past due bills for labor, material, and equipment resources and allowed Western to complete the work.

Western and Hartford substantially completed the.

## IV. Differing Site Conditions

The project records were clear as to the relevant conditions in Western's Contract. Article A.7 provided the following definitions:

A. Design-Build (DB) as defined by the Department of Veterans Affairs (VA) is the procurement by the Government, under one contract, with one firm or joint venture (JV) for both design and construction services for a specific project.

E. Design-Build (DB) as defined by the Department of Veterans Affairs (VA) is the procurement by the Government, under one contract, with one firm or joint venture (JV) for both design and construction services for a specific project.

The language in the Award, Article A.1.I, clearly defined the Scope of Work contemplated.

A. Contractor shall design and build a new steam condensate system, replacing or paralleling the existing underground trench and associated piping, running from Bldg. 8 boiler plant to the sub-basement of Bldg. 1.

B. Work will include:

1. Installation of new underground steam and condensate mains complete with new concrete trench with removable covers, pipe insulation, pipe hanger types LE; anchors, guides and expansion devices.

Privileged & Confidential
Final Draft for Submittal

2. Use existing manholes if possible or install new for change of directions and low point condensate trap installation.

3. Run new exposed insulated steam and condensate mains in areas where the existing piping is exposed. Coordinate tie-ins to minimize downtime of the steam and condensate mains.

4. Preparation of asbestos containment/abatement plan and associated cost in the event that disturbance of the existing asbestos is inevitable.

The language in the Award, Article A1.II, and Phase II continues:

> Resurface all areas disturbed by construction including but not limited to concrete, asphalt, grass, and gravel.

These cites provide the basis for the Design Build Contract. Western executed one contract to perform design work and construction work. The concept in the contract was to design a new underground steam condensate system, replacing or paralleling the existing underground trench from Bldg. 8 Boiler Plant to the Sub-basement of Building 1.

The VA's insistence to design and construct an overhead steam and condensate system in lieu of the underground system contracted by the VA represented a change in conditions (VAAR § 52.236-2) to the Contract.

The schematic design concept, which was finally adopted, required steam and condensate pipes be placed in an existing underground concrete trench box that extended south from Building 8 Boiler Room, around of the Maintenance Building the edge of 11th Street. From there, the pipe ran on a steel structure constructed over 11th Street, continuing to Building 24, and then along Building 1 to an inside corner, vertically up two stories to the roof, across the roof to a mechanical chase, and then down four stories to the sub-basement of Building 1.

This design required additional work to support the steam and condensate system. Piping had to be supported by a new steel structure from the end of the existing concrete trench box to Building 1 Sub-Basement. An "A" frame support was constructed to support vertical piping from the trench box to the side of the Maintenance Building. Steel knee braces were fabricated and bolted onto the Maintenance Building walls to support the piping work. At the edge of the Maintenance Building, a steel bridge was constructed over sidewalks and 11th Street to the edge of Building 24. Knee braces were through bolted on Building 24 and Building 1 to support pipe from the end of the bridge to the inside corner adjacent to the loading docks at Building 1. From there, the pipes were installed vertically on steel supports, to reach the roof at the third story level. Pipes were laid diagonally across the roof on steel supports toward a mechanical chase. Finally, pipes were installed on a steel support system down the existing chase to Building 1 Sub-basement where they were connected to the existing steam and condensate system.

The design of the supporting steel structure required Western to retain a Structural Engineer to fully design a structure capable of supporting the piping systems. Knee braces were designed for use along existing buildings using and anchoring system to attach the knee braces to the brick structures. Similar braces were used to support the piping system vertically. A supporting system for the roof was devised to support the pipe and allow

Privileged & Confidential
Final Draft for Submittal

expansion. These roof braces were attached to the underlying roof structure. That meant a penetration to the existing membrane roof was necessary at each support point. The construction of the supporting structure and piping system were more costly than excavation, backfill, and resurfacing required using existing concrete trenches. Additional lifting equipment for men and material was required to install the support brackets, pipe and insulation. The production rate to install and weld the piping work twenty feet off the ground, in position on the steel structure was significantly less than that required to install piping work in existing trenches. During knee bracket installation, Western was forced to change anchorage from "drill in" to 'through the wall" because of unknown existing deteriorated conditions. Instead of drilling around four inches and inserting an anchor, Western had to drill about eighteen inches and then have personnel inside the building as well as on the lift to install the through bolts and braces. Abruptly, and contrary to the Contract Documents, the VA required this installation work be performed off hours and on week-ends on premium time.

Western encountered additional differing conditions when it discovered lean concrete backfill instead of compacted soil or gravel on existing trenches. Western was paid to remove and dispose of the lean concrete, but was not paid to purchase new gravel backfill.

The approved route required condensate pumps not required in underground routing. The VA forced Western to design redundant pumping systems. As a result, Western had to provide second pump for every application. Western had to provide a second piping system from the main to the pump and back to the main. The piping had to be insulated and covered with a protective cladding. Western had to the purchase a stand-by pump and then contract for pump installation. Western also had to provide an electrical starter and wiring, and then control. Now the control system had to alternate pump operation and report failure for two pumps instead of one. This new VA condition affected both projects. Four extra condensate pumps, with two tanks, piping and insulation were required on the Steam and Condensate project. Two Variable Frequency Drive water pumps, piping and insulation were required on the Hot Water project. Next the VA added a control requirement to announce alarms in its central control room in additional the local alarms. monitoring, and annunciation system. This VA decision affected all pump systems both projects. All of this additional work was a change in conditions to the original Contract.

## V. Discussion

This project had mistakes by all parties. In the end, Western was irreparably damaged due to actions by the VA.

According to Western, Ms. Nation wanted an award to capture and not loose funding appropriated in that fiscal year and bent the contracting process to achieve that goal. That explains why Ms. Nations did not alter the Scope of Work for the reduced price when she actually purchased an underground steam and condensate system, which was estimated at approximately half the overhead cost by Western.

Western proceeded with design and construction of an overhead steam and condensate system based upon his agreement with Ms. Nations, in spite of the actual language in the Contract. At the beginning of the project, Ms. Nations gave every indication of following her verbal agreement, and that observation is supported by her "let me know" letter of November 24, 2003.

Privileged & Confidential
Final Draft for Submittal

When Ms. Nation died, Western advised the VA of the agreement with Ms. Nation. Western thought there would be notes in the file to support his story and work would continue according to the agreement with Ms. Nation.

When Western advised the new Contracting Officer, Jan Bertapelle-Anderson of the actual deal and the cost overruns, Ms. Bertapelle-Anderson should have stopped work and carefully reviewed the Contract Documents. That did not occur. There were no partnering sessions or negotiating sessions to work out a reasonable solution. Instead the VA unilaterally responded there was no merit for additional funding, and further that, Western was required to complete the Contract per the contract requirements. The VA completely forced its will onto Western when it VA forced Western to continue to construct an overhead steam & condensate system even though this scope was clearly beyond the terms of the Contract.

The letter went on to require other work beyond the scope of the Contract. Either Ms. Bertapelle-Anderson did not read the Contract, or she did not understand the Contract. In either case, Ms. Bertapelle-Anderson's response was incorrect and completely contrary to the tenants of fair dealing of partnering on a small business set aside contract.

When the VA responded and Western learned the VA had no intention of honoring Ms. Nations agreement, Western should have immediately stopped the work and advised the VA that Western would continue with work as contracted; that is, in strict compliance with the Contract Documents, and construct an underground steam and condensate system. Unfortunately design and construction was too far along using the overhead design.

An underground steam and condensate system represented the only Scope of Work ever contracted by the VA.

At the same time Western was trying to work out issues with payment and scope between and overhead and underground system, the VA decided to enforce other standards beyond the requirements of the contract. There were no provisions in the Contract Documents to have redundant systems. Western and M-E concurred with the VA that a concurrent design was superior, but argued redundant systems were not part of the Solicitation and not included in the pricing of either Contract. The VA forced Western to install redundant systems.

The VA continued to force Western to implement an above ground routing, and to design and construct fully redundant pumping systems for water and condensate systems, which made it only a matter of time before Western could not perform. What the VA demanded Western to construct, cost more that twice the amount in the Contract. Western poured all its resources into the project. Western continually requested additional funding and the VA continually rejected the requests. As a result of lack of funding and being forced to perform work clearly outside of the Contract, Western was forced out of business by the VA.

In its prelude to default terminate Western; the VA issued three letters. On October 7, 2003, Ms. Bertapelle-Anderson sent a "Show Cause Notice" to Western notifying Western the Government was considering terminating the Contract for Western default for failure to pay subcontractors. Western responded on October 22, 2004 with the second letter describing his dealings with Ms. Nation. In addition, Western contended the project had taken twice as long that work had to be performed on premium time not during normal working hours, that there were weather issues, and there was loss in productivity. The VA responded on

Privileged & Confidential
Final Draft Submittal

December 17, 2004, summarily denying any additional compensation. The VA's letter provided a specific list of remaining work items:

1. Complete the 4" condensate piping to manhole at Building 6, approximately 25 feet, and remove the temporary 4" condensate above ground line from Building 6 to the Boiler Plant, approximately 100 feet.
2. Install Pura-Fill Insulation in trench from Building 6 to manhole, approximately 25 feet by 6 feet wide by 3 feet deep.
3. Backfill trench with flowable dry concrete mix, from Building 6 to Building 8, approximately 125 feet by 6 feet wide by 4 feet deep.
4. Repave asphalt over trench, approximately 125 feet by 7 feet wide by 6 inches thick.
5. Install waterproof housing at Building 1 and Building 6 for steam and condensate piping penetration points.
6. Install protective corrugated metal skin to steam and condensate piping above ground structural support system, approximately 300 feet by 4 feet on top and 4 feet on one side.
7. Complete the electrical power and control wiring to 3 of the 4 new condensate pumps located in the subbasement of Building 1.

Items 2, 5, and 6 were determined not to be part of the contract during completion. Item 7 was an item in dispute. The Solicitation did not contain any requirements for redundant pumping or control systems. This work was performed under a reservation of rights during completion. Item 1 was predicated upon an outage, which was delayed by the VA well into completion. Item 4 could not be completed until Items 1 and 3. There were no requirements in the Solicitation to furnish and install flowable concrete backfill; gravel backfill was provided but not paid by VA. This work was performed under a reservation of rights during completion.

On February 10, 2005, the VA issued its "Final Decision" notifying Western it was terminated. This letter reiterated the VA's denying previous Western requests and again recounted the same seven items above as work to complete.

Taken together, the narrative and completion list, it appears the VA did not refer to the Scope of Work in the Contract and in addition had a poor or misunderstanding of a Design-Build Contract. In any contract, the Scope of Work is the predicate for the work to be performed. Applied to this contract, the VA purchased an underground steam and condensate system and then required Western to design and construct an overhead steam and condensate system that required pumping systems. Then, the VA required fully redundant pumping systems for the Steam and Condensate Contract a well as for the Hot Water Contract. Although both Solicitations indicated all work be performed during normal business hours; the VA forced Western to perform a majority of the work off hours at premium costs.

The VA's conduct with Western was akin to a class bully to a weakling, rather than a partner with a small business contractor. The record shows the VA never correctly understood what they purchased, but instead, forced Western to provide what they wanted regardless of the terms of the Contract. The VA should have worked out the differences with Western instead of making unilateral decisions, which lead to a wrongful termination.

Privileged & Confidential
Final Draft Submittal

## VI. Conclusions

1. Western was advised by the VA to submit a bid to construct an overhead steam and condensate system.
2. Western submitted a bid exceeding $800,000 to the VA.
3. VA rejected that bid.
4. VA entered into a Contract for the original Solicitation Scope of Work at roughly half the original offer price.
5. Ms. Nations died without disclosing any facts, other than the executed Contract Documents.
6. Western advised Ms. Nation's replacement, Ms. Bertapelle-Anderson of verbal agreements made between Ms. Nation and Western.
7. Ms. Bertapelle-Anderson rejected Western's story and refused additional funding, while at the same time demanding Western complete its work according to Contract.
8. Ms. Bertapelle-Anderson was in error because the work forced upon Western was more than was required by the terms of the Contract.
9. The VA imposed requirements beyond the terms of the Contact onto Western.
10. There VA made no direct attempt and there were no partnering sessions to work out a reasonable solution.
11. Western's work was dramatically increased.
12. Most of Western's work was performed under changed conditions.
13. Western was forced to work off hours and week-ends at premium costs.
14. Western's productivity to install the supporting structure and piping system overhead was substantially less that it would have been to install in existing trenches.
15. Western was wrongfully terminated.
16. The Surety should recover all costs incurred to complete.
17. Western is entitled for recovery for costs for work above the requirements of the Contract.

## VII. Damage Calculations

Western and Hartford are seeking damages based upon a modified total cost approach. This approach was used because the nature and extent of the impacts, and then to assess the impacts to the proper project, make it highly impracticable to otherwise determine the damages to a reasonable degree of accuracy.

Adjustments were made to the Western and Hartford completion costs to remove those costs such as corrective work and clean-up. This was accomplished by using an estimate.

LYNX CONSTRUCTION & CONSULTING, *LLC*

Lyn R. Farley
President

Privileged & Confidential
Final Draft for Submittal

## VIII. Damages

| | |
|---|---|
| Total Western Cost *(before Termination)* | 705,062.15 |
| Hartford Completion Costs | 364,916.04 |
| Western Completion Costs | 75,000.00 |
| Bond Costs | 17,992.51 |
| Insurance Cost | 20,351.99 |
| Total Cost | 1,183,322.69 |
| Less Payments to Western | (660,174.43) |
| Less Payments to Hartford | (171,368.13) |
| Shortfall | 351,780.13 |
| Western Overhead and Profit (Calculated) | 177,498.40 |
| Western Lost Profits | 50,000.00 |
| Western & Hartford Damages | 579,278.54 |
| Adjustment for Western & Hartford Costs | (18,000.00) |
| Damages Sought By Western & Hartford | 561,278.54 |

| | |
|---|---|
| Projected Interest (estimated using prompt payment interest rate of 18%) | $158,925.15 |
| Approximate Current Attorney and Consultant Fees | $ 25,000.00 |

Privileged & Confidential
Final Draft for Submittal

# Lyn R. Farley

*EDUCATION:*

B.S. Civil Engineering, 1974, University of Missouri - Rolla.
Registered Professional Engineer - Missouri.
License General Contractor in California (B-1)
Certified Surface Mine Supervisor, Department of Mines and Minerals, State of Illinois.
Certified Shaft and Slope Supervisor Underground Construction, Department of Mines and Minerals, State of Illinois.

*EXPERIENCE:*

| | | |
|---|---|---|
| *2002 to Present* | LYNX CONSTRUCTION & CONSULTING, LLC. *(Merger of Saguaro Construction, Inc. and The Construction Analyst)* | *President Consultant* |
| *1995 to 2002* | *Saguaro Construction, Inc.* | *President* |
| *2000 to 2002* | *The Construction Analyst* | *President Consultant* |
| *1991 to 2000* | *Sage Construction Consulting formerly FORCON International* | *Consultant* |
| *1983 to 1991* | *Alberici / Denver Inc. (Subsidiary of Alberici Corp.)* | *CEO Vice President Operations* |
| *1979 to 1983 1974 to 1976* | *J.S. Alberici Construction Co. Inc.* | *Project Manager Project Engineer Estimator* |
| *1976 to 1979* | *Gunther Nash Mining Construction Co. (Subsidiary of Alberici Corp.)* | *Project Manager* |
| *1972 to 1973* | *E. T Simonds Construction Co. Inc.* | *Field Engineer* |
| *1971 to 1972* | *Crawford and Whiteside Civil Engineers* | *Engineering Tech* |
| *1970 to 1971* | *Department of Transportation, State of Illinois* | *Engineering Tech* |

Privileged & Confidential
Final Draft for Submittal

*As President:*

Day to day management of the company which specializes in negotiated design–build contracts including:

- Construction Management and Execution
- Contract Negotiation
- Estimating & Budgeting
- Value Engineering and Constructability
- Client & Subcontractor Relations
- Master Scheduling

*As Consultant:*

Handling Surety and Construction Claims throughout the United States including:

- Litigation Support
- Claim Development and Analysis
- Investigative Services on Property, Development, Environmental and Construction Disputes
- Construction Management for Completion Work
- Expert Witness

*As CEO Vice President:*

Complete operational and administrative responsibility for the Denver, Colorado branch office and construction of over seventy-five projects in hotels, commercial buildings, and manufacturing facilities including:

- Construction Management and Execution
- Design Build
- General Contracts
- Estimating
- Value Engineering and Constructability
- Client Relations - Corporate Level
- Subcontractor Relations - Corporate Level

The staff was over thirty including project managers, support engineers, estimators, architectural and engineering designers, accountants, and clerks, to complete as many as fourteen projects per year exceeding fifty million dollars volume per year.

- Design/Build a 229,000 sf non-nuclear manufacturing facility with office and laboratory; Rockwell International-Department of Energy, Rocky Flats, Colorado.
- 65 hotels: Marriott Courtyard, The Residence Inn, Hampton Inn, and Radisson Hotel Corp., apartments, and condominiums, located in 24 states.
- 6 Target Stores; Dayton Hudson Corporation, Denver, Colorado.
- May D & F Store; May Department Stores, Colorado Springs, Colorado.
- SST Building, Martin Marietta Corporation, Lakewood, Colorado.
- Engineering Buildings A & B, Martin Marietta Corporation; Lakewood, Colorado.
- Silverthorne Outlet Mall; Silverthorne, Colorado.
- Design/Build of a 250,000 sf refrigerated storage, office, and truck shop, Anheuser-Busch, Denver, Colorado.
- Beer Packaging and Storage Building, Anheuser-Busch, Ft. Collins, Colorado.
- Construction of the Graduate Student Apartments, University of California, Irvine, California.

*As Project Manager:*

Responsibility for planning, programming, and supervising the projects assigned. Duties include working directly with the owner/customer in planning the work to assure cost effective and Constructability design, proper interface and turnover. Supervised scheduling, estimating, contract administration, construction, and completion of the following projects:

- Site and foundation work, Sierra Program, Ford Motor Company, Hazelwood, Missouri.
- Roof rehabilitation, Stacy Park Reservoir, City of St. Louis, St. Louis, Missouri.

Privileged & Confidential
Final Draft for Submittal

- 3000 TPD Lead Concentrate Producing Grinding and Milling Plant, ASARCO, Bunker, Missouri.
- Erection of precipitators and ductwork for Units 1-4, Union Electric, Meramec Station.
- Installation of raw coal stacking system, Zeigler Coal Company, Coulterville, Illinois.
- Erection of 5000 foot overland belt conveyor, Zeigler Coal Company, Coulterville, Illinois.
- Addition of fine coal cleaning circuit, Zeigler Coal Company, Johnston City, Illinois.
- Maintenance of man and material, production, and ventilation shafts, Virginia Pocahontas Division, Island Creek Coal Company, Vansant, Virginia.
- Erection of an automatic coal sampling system, Bethlehem Coal Company, Fairmont, West Virginia.
- Erection of a 100 TPH Coal Preparation Plant, Westbury Coal Company, Richlands, Virginia.
- Replacement of 13,000 tubes in a B&W Air heater, Union Electric, Portage des Sioux Station.
- Erection of a $NASO_2$ scrubber, Pfizer Chemical Company, East St. Louis, Missouri.

***As Project Engineer:***

Responsible to the Project Manager for planning, scheduling, layout, estimating, and directly supervising all field work on jobs involving concrete and steel construction, process piping, and equipment installation:

- Construction of an Automated Barge Manufacturing Facility, St. Louis Ship, Caruthersville, Missouri
- Installation of process equipment to make Mainstay Dog Food, Ralston Purina, Clinton Iowa
- Erection of a Grit Handling System, Metropolitan Sewer District, St. Louis, Missouri

Priviledged & Confidential
Final Draft for Submittal

## Lyn R. Farley

*Testimony as an Expert Witness*

| Date | Case | On Behalf Of |
|---|---|---|
| 4/01 | U.S. District Court<br>Western District of MO.<br>Southern District<br>Case No. 94-3465-CV-S-4<br>Donald Maggi, Inc.<br>v.<br>C. Iber & Sons, et al<br><br>National Ben Franklin Insurance Co | National Ben Franklin Insurance Co. – surety of C. Iber & Sons (D) |
| | U.S. District Court<br>Eastern District of TN<br>Cumberland Surety Insurance Company, Inc.<br>v.<br>City of Ervin | Cumberland Surety & Insurance Co. (T) |
| 2/00 | AFT Inc.<br>v.<br>Porta-McCurdy Development Company LLC<br>Case No.: 58-110-00100-97 | AFT Inc. (T) |
| 11/00 | AFT Inc.<br>v.<br>Kromm, Rikimaru and Johansen, Inc. | AFT Inc. (T) |
| 2/01 | Centerre Construction, Inc.<br>v.<br>Wicks Lumber | Centerre Construction, Inc. (T) |
| 4/01 | Donald Maggi Construction Company<br>v.<br>National Ben Franklin Insurance of Illinois<br>Case No.: 57-110-007499 | National Ben Franklin Insurance Company (T) |
| 6/01 | Mid State Surety Corporation<br><br>Montcalm County Drain Commission and Earth Tech, Inc. | Mid-State Surety (D) |
| 6/02 | Mid State Surety Corporation<br>v.<br>Western Surety Company<br>And<br>Salameh Bros. Construction Co.<br>16 110 00607 1 | Mid-State Surety (T) |
| 2/02 | Mid State Surety Corporation | Mid-State Surety (D) |

Privileged & Confidential
Final Draft for Submittal

| | | |
|---|---|---|
| | v.<br>Madigan Construction Company<br>Paul W. and Carolyn Madigan<br>United State District Court for the District of Maryland<br>At Baltimore | |
| 3/02 | Willow Run Housing, LTD and<br>Willow Run Housing II, Inc.<br>v.<br>Construction Supervisors, Inc.<br>United Pacific Insurance Co.<br>And Reliance Insurance Co.<br><br>Case No. 70-11000S2000 | Willow Run Housing LTD (T) |
| 9/02 | Fireman's Fund Insurance Company<br><br>v.<br>Eumenyte International Corporation; George Shaffer Construction Company; Luckenbach/Ziegelman & Partners, Inc.; Michael Hazard Associates; Frontier Fire Protection, Inc.; BFPE; Gary Steffy Lighting Design, Inc.; Tyco Electronics Corporation and Tyco International Limited | Fireman's Fund Insurance Company (D) |
| 2/03 | Ace Tile Incorporated<br>v.<br>Raymond Williams Construction Company | Raymond Williams Construction Company (T) |
| 10/03<br>11/04 | In the United States District Court<br>For the District of New Mexico, El Paso Division<br>Belt Con Construction, Inc.<br>v.<br>Metric Construction Co., Inc., and Safeco Insurance Company of America<br>CIV 02-1398 JB/LAM | Belt Con Construction, Inc. (D)<br>Belt Con Construction, Inc. (T) |
| 4/04 | In the United States District Court<br>For the Western District of Pennsylvania<br>Mid-State Surety Corporation<br>v.<br>East Bethlehem Township Municipal Authority<br>And Gaunett Fleming, Inc.<br>No.: 01-0240 | Mid-State Surety (D) |
| 4/04 | Superior Court of Arizona, County of Maricopa<br>The City of Phoenix<br>v.<br>Mid-State Surety Corporation and AMRA Construction Corporation<br>No.: CV2001-007139 | Mid-State Surety(D) |

"T" – cases in which testimony was given
"D" – cases in which deposition was given

Privileged & Confidential
Final Draft for Submittal